BOSMAN (SCHULTZ v.). See Case No. 12,-488.

BOSQUET (COPLAND v.). See Case No. 3,-212.

BOSS v. The GENERAL JACKSON. See Case No. 5,314.

BOSS (KNOWLTON v.). See Case No. 7,901.

## Case No. 1,667.

### BOSSEAU v. O'BRIEN.

[4 Biss. 395.][1]

Circuit Court, N. D. Illinois. July Term, 1869.

STATUTE OF FRAUDS — AUTHORITY TO SELL REAL ESTATE—EARNEST MONEY—RATIFICATION—CONSTRUCTION OF AUTHORITY.

1. Authority to an agent to sell real estate must be clear and distinct, of such a character that a fair and candid person must see without hesitation that the authority was given.

2. An answer to a letter from a real estate agent asking for authority to sell lands, "I will sell" on terms specified, does not confer the authority on the agent to make a contract of sale.

3. Correspondence between the real estate agent and the owner, concerning the lands and the price and the terms of sale, do not constitute authority to the agent to make a contract of sale, even on the terms specified by the owner.

4. The receipt of earnest money by the assumed agent does not bind the principal as a part performance.

5. Ratification, to be effectual, must be unequivocal, and with full knowledge of all the facts.

6. Failure to answer letters or inquiries from the agent as to the consummation of the sale do not constitute a ratification.

7. An authority to sell must be strictly construed, and the purchaser must show that the

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

contract complies fully and entirely with the authority.

8. An agent making a contract of sale should forward a copy of the contract to the principal.

In equity. This was a bill filed by Peter Bosseau for the specific performance of an alleged contract of sale made by the defendant [Cornelius O'Brien] with the complainant in August, 1864, for the S. ½, Sec. 25, 32 N., R. 12 E., in Kankakee county. [Bill dismissed.]

John Woodbridge, Jr., for complainant.
I. N. Stiles, for defendant.

DRUMMOND, District Judge. The question is whether there was a contract of sale made at that time of such a character that the plaintiff is entitled to have the contract performed. The defendant was at that time the owner of the land. The bill sets forth that a contract was made, and the answer denies it, and insists upon the statute of frauds. The plaintiff seeks to make out the existence of the contract through a sale by James McGrew as the agent of the defendant, and the testimony consists mainly of the letters and correspondence between Mr. McGrew and the defendant, and the deposition of Mr. McGrew himself.

It is proper, in the first place, to look at the written evidence, about which, of course, there can be no mistake. The first is a letter from Mr. McGrew to the defendant, dated December 28, 1863. It should be observed that McGrew resided at Kankakee city and the defendant at Lawrenceburg, Indiana. In that letter Mr. McGrew informed the defendant what the amount of taxes upon his land was, and stated to him a willingness on his part to pay the same, also asked him whether the lands were for sale and at what price, and informed him he was a real estate agent and willing to serve him. The defendant, on the 29th of January, 1864, acknowledged the receipt of this letter, and stated to Mr. McGrew that Mr. A. B. True had done business for him and attended to his taxes. He asks whether the lands in his neighborhood are salable, and at what price, and he makes this remark at the end of his letter: "Should I make up my mind to sell the whole or a part of my land, I may take occasion to avail myself of your services." Mr. McGrew answers this letter on the 5th of February, in which he says, "There is beginning to be some sale for real estate in this country," telling him that he should think his lands ought to sell for five to eight dollars an acre; that there is a great deal of unimproved land offered for sale, and that it is difficult to realize on that kind of land. On the 22nd of March McGrew writes to the defendant and asks him at what price he will sell two or three of his quarter sections of land; tells him if he could get ten dollars an acre on what was called canal terms, being one-fourth down,

the balance in one, two, and three years, with six per cent. interest annually, in advance, that it would be a good sale. The language is "would be a big sale." On the 14th of May the defendant replies to this letter, saying that he would not like to take ten dollars an acre for the land referred to by Mr. McGrew; but he says, "I have two quarter sections near Manteno (the land in controversy,) which I will take ten dollars per acre for on the, time and terms you propose."

It appears by the testimony of McGrew that when he received this letter he advertised the land for sale. On the 20th of May, Mr. McGrew answers this letter, and gives him a description of the land which he, the writer, understood the defendant owned, and among which tracts are the S. E. and S. W. ¼, Sec. 25, and says that he thought he could sell those tracts and another one, being the ones near Manteno, at ten dollars an acre, but he had been so long in getting an answer that the parties to whom he thought he might sell might have bought elsewhere. He says, "Please answer, and state if you still own the lands as above described. If so, shall I sell the three first-named tracts at ten dollars per acre if I have an opportunity?" two of which tracts were the south half of section 25; so that there was a distinct question put by Mr. McGrew to the defendant whether he should sell this tract of land. This letter does not seem to have been answered by the defendant until the 2nd of July, when he says, "I will sell the two quarter sections in section 25, 32 north, range 12 east, at ten dollars per acre on the terms stated in your former letter. These tracts are those next to Manteno."

It is to be observed that the question had been distinctly put, "Shall I sell?" The defendant does not tell him he may sell, but he says, "I will sell" these tracts of land. This is all there was of a written character, up to the time that the transaction took place between McGrew and plaintiff—indeed only authority, oral or written, upon which it could be said Mr. McGrew had a right, as representing the plaintiff, to dispose of this land. The question is whether, upon this evidence, as it stands, there was any written authority to sell the land. It seems to me clear that there was not. He had asked for the authority. The authority had not been given, but he had said, "I will sell the land," I do not authorize you to sell it, but "I will sell" it on the terms that you name.

On the 11th of August, 1864, a bargain was made between the plaintiff and Mr. McGrew of which this writing is the evidence:

"Received of Peter Bosseau one hundred dollars to apply as part of the first payment on the south half section 25, 32, R. 12 E. sold to him this day at ten dollars per acre, on canal terms, balance of first payment to be made as soon as contract is made which will be within thirty days, payments to be as follows: one-fourth down, balance in one, two and three years, with interest at six per cent. annually, in advance. Cornelius O'Brien, by James McGrew, Agent."

And on the same day McGrew wrote to the defendant stating that he had sold the tract of land at ten dollars an acre on canal terms as he, the defendant, "had instructed him" with the request that the defendant would send a warranty deed properly executed, and that he would return the notes and mortgage for the deferred and the cash payment. On the next day, August 12th, he wrote to the defendant, stating that he had forgotten to name the party to whom the deed should be made and with whom the transaction had taken place; and in this letter he names the plaintiff Peter Bosseau and the consideration money—three thousand two hundred dollars. To these letters he received no reply from the defendant, and it is to be remarked that he did not tell him the whole of the arrangement that had been made between him and the plaintiff; in other words, he did not send him a copy of the receipt which he had given, as the agent of the defendant, to the plaintiff. One quarter of the cash had not been paid, but only one hundred dollars.

Not having received any reply to these letters of August 11th and 12th, he wrote again on the 12th of September to the defendant, in which he recapitulated that he had on the 11th of August sold for him the south half section 25, at ten dollars an acre on canal terms as he had been "instructed to do" by the defendant. He repeats that he had sent for a warranty deed, and refers to the fact that he had not given the name of the purchaser and that might be the reason why the deed had not been sent, and in this he reiterates the request that a deed should be forwarded at his earliest convenience, and says that he will then send the cash payment and notes and mortgage. On the 9th of November he writes again to the defendant, stating that he had expected to see him before that time. Between the date of these last two letters he had seen the defendant. He had gone to Lawrenceburg and had an interview with the defendant. That was in October, and he says, "I called the defendant's attention to the matter of making the deed to Bosseau of said lands. He stated that he and his wife would be at Chicago within the next two or three weeks, and that he would then come down to Kankakee, execute the deed, and have the mortgage and notes executed to them and the matter closed up." The statement of the defendant in relation to what took place at that time is, that he distinctly and emphatically disavowed any connection whatever with this act of McGrew as his agent.

On the 1st of December, the defendant wrote McGrew a letter in which he says, among other things, "As soon as I feel better I will come out; until which time I will

postpone further action as to making a deed, etc. If you can inform the parties who intended to purchase," etc. Nothing being done, the defendant not having been to Kankakee nor seen McGrew, on the 30th of January, 1865, the latter again writes to the defendant, introducing Mr. Comstock, who now first comes upon the scene, to whom he had intrusted the notes and mortgage and the cash payment that had been made, with a request that he would hand the whole over to the defendant, and in this letter he reiterates the expression so often used in this correspondence, "This is the land I sold for you last summer at ten dollars per acre, on canal terms, as you authorized." Comstock's deposition has been taken, and he states that he went to Lawrenceburg, and that he tendered the money and notes and mortgage to the defendant, and that they were declined; and defendant says that he distinctly refused to have anything to do with it in any way, denying all authority on the part of McGrew to make sale of his land. The money, notes and mortgage thus being refused by the defendant, were returned to Mr. McGrew, and were produced from his possession when his deposition was taken. The deed, notes and mortgage are added as exhibits to his deposition. The money, the one hundred dollars which was paid on the 11th of August, still remains with Mr. McGrew. The remainder of the cash payment was not received by Mr. McGrew, and of course remains with the plaintiff.

There are three notes which, as now written, bear date August 11, 1864, payable one, two and three years after date, respectively for eight hundred and ninety-six dollars, eight hundred and forty-eight dollars, and eight hundred dollars, signed by Peter Bosseau. The testimony of McGrew is that these notes and the cash, were tendered within thirty days. The date of the notes was originally January, 1865. That is admitted by Mr. McGrew in his testimony, and it is manifest, upon an inspection of the notes, that such was the fact. The original date is erased, and August 11, 1864, written over the erasure; what day in January the notes bore date is not perhaps very clear, but it is certain that the original date was January, 1865; in fact, it must have been January 30 or 31, 1865, because the mark of the "3" is very distinct in all the notes. The same is true of the date of the mortgage.

The only serious question that I can see in the case is, whether the defendant ever ratified this act of McGrew as his agent. McGrew did make the sale; that is, he made the contract. Was it ratified by the defendant? I do not think that it was; neither do I think that the terms upon which the defendant said he would sell the land, even if we can suppose that there was an implied authority to sell, were complied with in the contract. A quarter cash was not paid at the time that the contract was made. If the plaintiff relies upon the contract as binding, he must show that the contract was made in conformity with the instructions of defendant; and if it was a complete contract, then those instructions must have been complied with fully and entirely; and it cannot be pretended, I think, even if we concede that he was instructed to sell in this ambiguous sort of a way, that the instructions were complied with. He clearly was informed that McGrew had sold the land for him but, as I have said, he was not told the precise terms of the contract. He was not told, in other words, that only one hundred dollars earnest money had been paid, and that the remainder was to be left until the deed was obtained. A copy of the receipt was not forwarded to him as it ought to have been. No answer was made to these letters. That did not look like ratification. The deed was not forwarded. That certainly did not look like ratification. The defendant did not manifest any desire to receive the cash payment. The only doubtful circumstance is a paragraph in the letter of December 1, 1864, but, fairly construed, can that be treated as a ratification of this act of McGrew? Does it look as though the defendant understood there was a certain contract binding upon him, with which he had anything more to do than simply to carry out its terms as agreed upon between McGrew and the plaintiff? I think not. He says, "I will postpone further action as to making the deed," of which you can inform parties "who intend to purchase." Not "who have purchased," but "who intend to purchase." He clearly does not treat it or regard it as a contract complete and finished, and in relation to which all he had to do was to make a deed and receive the money, notes and mortgage.

The fair interpretation of this whole arrangement, I think, is this, that McGrew, being a land agent, was very anxious to sell all he could, as by sales he obtained his commission and his living. The very moment he was told defendant was willing to sell this land, he advertised it, claims that he had authority to sell, repeats again and again that he was authorized to sell, and sells, presuming that the defendant would ratify the act, and it being understood, that there was a certain something to be done by the defendant in which he was to have the power of choice and determine as to the nature and character of the transaction.

Independent of the writings there is nothing but the testimony of Mr. McGrew and whatever would have a bearing upon the contract made with the plaintiff, of course it would be affected by the statute of frauds. All that the plaintiff can rely upon is his written contract. There is no pretence that there was or could be, an oral contract with such payment and part performance as will take it out of the statute of frauds. Whatever possession there was, was unknown at

the time; and so far as the evidence shows, not authorized by the defendant. The defendant never received any portion of the money, and there was not, therefore, what could be properly called part payment and the possession of the land. I say it must have been the understanding of the parties that there was some action to be done on the part of the defendant; that it was incomplete and unfinished because of the testimony relating to the notes and the mortgage. They were not executed until January, 1865—nearly six months after the transaction had taken place. The explanation given by Mr. Comstock of the alteration in the date of these notes, which McGrew admits he made, was that the defendant ought to have interest from the date of the contract; but while that may be true, and a sufficient explanation of the erasure and the new date to the notes, still it also demonstrates that the transaction was unfinished on the 11th of August, 1864.

It is nothing more than fair that we should take Mr. McGrew's explanation of his own conduct. From this it will appear that although he said he was authorized to make this sale, yet 'that it was an inference of his. He nowhere says in his deposition that he was authorized, but he presumed or supposed that he was authorized. He is asked whether he was authorized by O'Brien to receive the one hundred dollars. "A. I considered myself so. Q. Give your reason for considering yourself authorized by Mr. O'Brien to receive that payment of one hundred dollars. A. From my correspondence with Mr. O'Brien, the fact that he knew I was acting as real estate agent, and that I had written him once that I had an offer for some of his lands, which he declined but in reply stated that he would take ten dollars per acre for this on the terms that I had specified as connected with the other offers." That is his explanation. Compare it with the facts. O'Brien had told him he would take ten dollars an acre for this half section of land. After he had told him so he had asked him, "Shall I sell for you" on such terms? No reply. He at the time did not consider it authority to sell, but he asked for authority. That the authority was given, was an inference of Mr. McGrew, not warranted, as I think, by the facts.

It is sought now to make out a ratification. I think the facts do not warrant the conclusion that there was a ratification of this unauthorized act of Mr. McGrew. This concerns real estate by which the defendant is to be deprived of his title to the land. The evidence should be clear and distinct, and of such a character that there could not be any hesitation in the mind of a fair and candid person, when scanning it, in coming to the conclusion that the authority was either given or that the act which was done by the party was ratified as the act of the principal. It will be observed that McGrew,

after being subjected to a pretty rigid cross-examination, when asked when the notes and mortgages were tendered to him, says that they were tendered immediately after their execution. That must have been the latter part of January or the first of February 1865. I have thus gone through with all the evidence that bears upon the question, and have come to the conclusion that there was no authority given to McGrew by the defendant to sell this land, neither has there been any ratification by the defendant of the contract made by McGrew on the 11th of August, 1864.

I have thus far said nothing of the interest which Mr. Comstock had in this property, or of the circumstances of the alleged inadequate price for which the property was sold. Mr. Comstock was equally interested with the plaintiff in this contract, advanced some of the purchase money, and even one-half of the hundred dollars that were originally paid, and helped to make up the tender that was offered to the defendant by Comstock in February, 1865; but I lay no particular stress on these additional facts. They might become material under another aspect of the case. The bill will be dismissed.

NOTE [from original report]. For a full discussion of the question, what is sufficient to constitute an agency, see McConnell v. Brillhart, 17 Ill. 360, where, on full review of the authorities, it is laid down as the rule that no form of language is necessary, and that notes and memoranda indicating such intent are sufficient. Fry, Spec. Perf. § 353 et seq. The contract need not be on one piece of paper nor entered into at one time, but several papers may be connected. Esmay v. Gorton, 18 Ill. 483. The English cases hold that a contract may be made out from correspondence. Stratford v. Bosworth, 2 Ves. & B. 341; Huddleston v. Briscoe, 11 Ves. 583; Western v. Russell, 3 Ves. & B. 187. Ratification will be presumed on slight grounds, and will take a case out of the statute of frauds. Story, Ag. §§ 244, 445; MacLean v. Dunn, 4 Bing. 722. But must be with full knowledge of all material facts. Owings v. Hull, 9 Pet. [34 U. S.] 608; Hays v. Stone, 7 Hill, 128.

If a party places his refusal to execute a contract on a different ground, he cannot afterwards deny the agent's authority. Harding v. Parshall, 56 Ill. 219. A party rescinding a contract must return or tender whatever he has received under it. Peoria, M. & F. Ins. Co. v. Botto, 47 Ill. 516, affirming Smith v. Doty, 24 Ill. 165; and Buchenau v. Horney, 12 Ill. 336; Bowen v. Schuler, 41 Ill. 193; Murphy v. Lockwood, 21 Ill. 619. The party against whom a rescission is sought must be placed in statu quo. 1 Hil. Vend. 33 et seq.; 1 Sugd. Vend. 306; Johnson v. Jackson, 27 Miss. 498; Aetna Ins. Co. v. Maguire, 51 Ill. 342; Kinney v. Kiernan, 49 N. Y. 164, affirming Wheaton v. Baker, 14 Barb. 594. See, also, Masson v. Bovet, 1 Denio, 74; Moyer v. Shoemaker, 5 Barb. 322, 323, citing many authorities; also, Voorhees v. Earl, 2 Hill, 292, 293; Coolidge v. Brigham, 1 Metc. [Mass.] 550; Longworth v. Taylor [Case No. 8,490]. This is true though the article received was of inconsiderable value. Conner v. Henderson 15 Mass. 321; Ayers v. Hewett, 19 Me. 281; Boston v. Nichols, 47 Ill. 356. Or even the note of the other contracting party. Kimball v. Cunningham, 4 Mass. 502. Authority to an agent is to be construed to include all necessary or usual means of executing it with effect. Paley Ag. 189;

1 Pars. Cont. 57: Story, Ag. § 58. As to what is sufficient authority to an agent to make a valid contract for the sale of real estate, consult Bissell v. Terry, Sup. Ct. Ill. Sept. term, 1873, opinion filed Jan. 30, 1875 [69 Ill. 184].