## MANNIX *v*. HILDRETH.

CONTRACTS TO SELL REAL ESTATE; REAL ESTATE AGENTS; SPECIFIC PERFORMANCE.

1. Mere authority to a real estate agent to sell real estate, does not carry with it the implied power to make a contract for sale, upon the owner's terms, that will bind him.

2. A real estate agent's duty is to obtain the best price that he can for his principal, and to scrupulously avoid placing himself in a situation which may conflict with this duty; and any attempt to occupy the relation of agent to two persons whose interests conflict, whether with or without notice to them, is contrary to the principles of equity.

3. Equity will never decree specific performance when, independent of the contract, circumstances are developed which would render it unjust, or tend in the slightest degree to encourage deception.

4. A real estate agent becomes entitled to his commission when he shall have procured a purchaser at the owner's price and terms who is ready to close and able to perform the contract.

5. To authorize a real estate agent to make a contract to sell real estate, the words used, whether verbal or written, should be distinct and clear in their meaning and import, and should manifest the intention of the principal to do something more than employ the agent.

No. 67.   Submitted November 9, 1893.—Decided February 5, 1894.

Hearing on an appeal by the complainants from a decree of the Supreme Court of the District of Columbia, holding an equity term, dismissing a bill for specific performance. *Affirmed*.

The Court in its opinion stated the case as follows:

Mannix & Stevens instituted this action to enforce specific performance by Mrs. Florence Hildreth of an alleged contract of sale of sub-lot 38, in square 217, in the city of Washington. About May 28, 1890, Mrs. Hildreth informed Hill & Johnston, real estate agents, that if she could purchase another house she would like to sell her said lot for $18,000. Early in June she authorized them to lease the house furnished, and then left the city for the summer. They entered the property in their books and attempted to find a purchaser. In reply to a letter from Hill & Johnston asking her lowest terms, she wrote them July 14, naming $17,000 in cash. No other condition was named. They advertised the property for sale, but one of them who testified in the case said that they would not have undertaken to make a contract of sale upon receipt of an offer of either sum, without approval and authority of Mrs. Hildreth.

In July, 1890, one E. C. Baumgrass, an employee of Pitney & Bradford, another firm of real estate agents, heard that the property was for sale at $18,000, and recommended its purchase to Mrs. McLinden, a client of said firm, who thought so favorably of it that he wrote the following letter to Mrs. Hildreth:

"Washington, D. C., July 17, 1890.

"Mrs. Florence Hildreth.

"Dear Madame: We have an offer of ($17,000) seventeen thousand dollars for your house, corner of 14th and L streets, N. W., which we are requested to submit. The party proposes to pay six thousand dollars in cash and for balance give note, secured by deed of trust on the property,

and payable in three years, with interest at 6 per cent. per annum, interest payable semi-annually. In case this offer is satisfactory our commission will be 3 per cent. for effecting sale. We will thank you for prompt reply.

"Very respectfully,

"Pitney & Bradford,

"Per Baumgrass."

To this she made the following reply:

"July 20, 1890.

"Pitney & Bradford.

"Dear Sirs: Your letter in regard to the purchase of my house, corner 14th and L, just at hand. I will accept $18,000 *on the terms mentioned in your letter*, with the exception of $10,000 down, or $17,000 cash.

"My only reason for wishing to sell my house is that 14th street is becoming a business street.

"Yours, etc.,

"F. Hildreth.

"Address: Waterford, New London Co., Conn."

Mrs. McLinden concluded to purchase the house and lot at $17,000 cash, and Pitney & Bradford took her check for $500 on her trustee, Mr. Johnston, of Riggs & Co., and executed the following contract of sale:

"Washington, D. C., July 24, 1890.

"Received from Mary McLinden a deposit of five hundred ($500) dollars, to be applied in part payment of the purchase money for lot 38, in square 217, with improvements thereon, the price for which said lot is hereby sold being seventeen thousand dollars ($17,000), on terms as follows: Purchase price all cash upon execution and delivery of proper deed. Title guaranteed good or deposit refunded and sale canceled. Seller and her agents assume no responsibility for cost of abstract nor for any damages should title

upon examination prove defective. All taxes to be paid by seller to date of deed. Purchaser is required and agrees to make full settlement, in accordance with terms of sale, within thirty days from this date, seller to give the usual special warranty deed. Conveyancing at cost of purchaser.

"PITNEY & BRADFORD,
"Agents for Mrs. Hildreth."

On the same day they wrote the following letter to Mrs. Hildreth:

"WASHINGTON, D. C., July 24th, 1890.

"Mrs. F. HILDRETH.

"Dear Madame: Your favor of the 20th instant at hand, and we have this day sold your property, No. 1022 14th street, for $17,000 cash, sale to be completed within thirty days, and would like you to advise us at what date you can give possession of premises, as the purchaser is desirous of occupying the house at as early a day as possible after passage of title.

"If you have a certificate or abstract of title we will thank you to send it to us for purpose of examination, and if you have no title paper we will thank you to so inform us in order that abstract may be ordered.

"Your niece, Miss Ada Rhodes, mentioned that possibly you might wish to dispose of some articles of furniture now in the house, though she could not say with any certainty. If such is your wish we will be pleased to speak to the purchaser in relation thereto.

"After examination of title and preparation of papers we will communicate with you, and the deed can be forwarded to you for execution, or you can come to Washington, as bests suits your convenience.

"Yours, very respectfully,
"PITNEY & BRADFORD,
"Per BAUMGRASS."

The following reply to this letter was received:

"July 26, 1890.

"PITNEY & BRADFORD.

"Dear Sirs: Yours of the 24th just received. The abstract of title, tax receipts, and insurance policy are with my private papers in the safe deposit at Washington. I did not expect to vacate my house till fall, when I could attend to the removal of my personal effects, etc. Please let me know if it is necessary to have possession before fall, as I do not feel able to go to Washington in hot weather. Everything about the house is all clear; taxes and insurance paid to December next.

"Very truly yours, etc.,

"F. HILDRETH.

"Waterford, New London Co., Conn."

On the same day that Mrs. Hildreth answered the first letter of Pitney & Bradford—July 20—she wrote to her niece, Miss Rhodes, who lived in Washington, telling her of the letter of Pitney & Bradford, and asking her to go and see who they were and learn who wished to buy her house. Miss Rhodes called on the 24th and heard that the offer was made by Mrs. McLinden—she was not told that a contract of sale had been actually made—and on the 25th she wrote to her aunt telling of her visit to Pitney & Bradford, and informing her that they had just sent her a telegram, and would write her a letter on the same day, saying that the "applicant," Mrs. McLinden, would take the house at $17,000 cash, and would want to get possession August 15th. She advised her to accept the offer, and added, "If the lady can't take possession of the property at once the sale may fall through, as she is anxious to settle herself and her furniture; and if she has to wait until October for your return to get in the house, she will probably look elsewhere, so you had better come and settle it." To this Mrs. Hildreth replied that she would do nothing about sell-

ing the house until she came back in the fall. Miss Rhodes testified that she delivered this message to Pitney a few days after its receipt, and he asked her if she thought Mrs. Hildreth could deliver the house in thirty days. In answer to this she told him that she did not think so, as she was not in the habit of returning to Washington until October. She saw Mrs. Hildreth at Saratoga in August, and on her return, about September 19th, told Mr. Pitney that she (Mrs. Hildreth) would not sell the house or do anything until her return in the fall, and Mr. Pitney said she need not hurry herself.

At the same time, she learned from a Mr. Sellman, who was present, that he had sold his house to Mrs. McLinden. She asked Pitney at once about this, and he told her that Mrs. McLinden had withdrawn from her proposed purchase on the advice of her trustee, and that a Mr. Stevens proposed to take it.

It appears that, at the same time Pitney & Bradford were negotiating for Mrs. McLinden, they were talking to Stevens about the same purchase. He was anxious to make the purchase, and was disappointed when told on the 24th that Mrs. McLinden would buy the property. As her trustee advised against her closing the trade, Pitney & Bradford told Mrs. McLinden they would find a buyer to take her place. Baumgrass testified that he thought the property cheap at $18,000, and that he had told Stevens of the offer made in the letter of July 17, but that he did not expect to get it for that. He also told Stevens he could have the second chance at it. On July 25, after Mrs. McLinden had withdrawn, Pitney & Bradford took the check of Stevens for $500, dated July 24th, and as of the same date executed to him the following receipt as a contract of sale:

"WASHINGTON, D. C., 24 July, 1890.

"Received from Edward Stevens a deposit of five hundred ($500) dollars, to be applied in part payment of the purchase money for lot 38, in square 217, with improvements thereon; the price for which said lot is hereby sold, being seventeen

thousand dollars ($17,000), on terms as follows: Purchase price all cash upon execution and delivery of proper deed.

"Title guaranteed good or deposit refunded and sale canceled. Seller and her agents assume no responsibility for cost of abstract nor for any damages should title, upon examination, prove defective. All taxes to be paid by seller to date of deed. Purchaser is required and agrees to make full settlement in accordance with terms of sale within thirty days from this date; seller to give the usual special warranty deed. Conveyancing at cost of purchaser.

"PITNEY & BRADFORD,
"Agents for Mrs. Hildreth."

Some time after this the contract with Mrs. McLinden was given to Stevens, also, with the following endorsement thereon, signed by Mrs. McLinden.

"24 July, 1890.

"In consideration of the sum of one dollar to me in hand paid, the receipt whereof is hereby acknowledged, I hereby assign to Edward Stevens, the within receipt for a deposit of five hundred dollars ($500), made with Messrs. Pitney & Bradford, and to be applied in part payment for the purchase money for lot 38, in square 217, for the sum of seventeen thousand dollars, together with all my rights and privileges thereunder.

"MARY McLINDEN."

Complainant Mannix was interested with Stevens in the purchase, though his name did not appear in the papers.

Mrs. Hildreth was not aware of the existence of the alleged instruments or the deposit of any money until the suit had been instituted.

Pitney, as a witness, said he had no improper motive in antedating the contract with Stevens, or the assignment of Mrs. McLinden, "but did it because there might arise a question about substituting Stevens in place of Mrs. McLinden—that is, I would report to you that I have sold your

property to Mr. Jones, and then I substitute Mr. Brown, you would like to know why."

While the contract called for execution within thirty days, it appears that Stevens preferred sixty days or even later, as he could not expect any revenue from the house during the summer.

The next letter from Pitney & Bradford is the following:

"WASHINGTON, D. C., July 26th, 1890.

"Mrs. F. HILDRETH,

"Waterford, New London Co., Conn.

"Madam: Since writing you on the 24th instant we find that the sale of your Fourteenth street house may be concluded in thirty or sixty days after 24th July, according to your best convenience, as the party purchasing is willing to defer to your wishes in the matter, and we will thank you to advise us as to which time will better suit your plans.

"Very truly,

"PITNEY & BRADFORD."

This letter and Mrs. Hildreth's, of the same date, necessarily crossed each other en route. Mrs. Hildreth testified that she wrote Pitney & Bradford after receipt of the above letter, and before August 1, that she would defer the matter of sale until her return in October. Pitney had no recollection of the receipt of such letter. In corroboration of Mrs. Hildreth's statement, it was shown that she received a letter dated July 29, 1890, from Hill & Johnston, referring to negotiations they had had with a prospective purchaser at her price, and asking if it was true that she had sold the property, to which she replied as follows:

"August 2d, 1890.

"HILL & JOHNSTON.

"Dear Sirs: Yours of the 29th just at hand. I received an offer of $17,000 cash for my house from Pitney & Brad-

ford. I wrote them a few days ago, requesting them to defer the matter until my return to Washington in the fall.

Very truly yours, etc.,

"F. HILDRETH.

"Per F. A. H.

"Waterford, Conn., August 2d, 1890."

There was no more correspondence between Pitney & Bradford and Mrs. Hildreth until October 9, 1890, when they addressed a letter to her, stating Stevens' anxiety to obtain possession. Replying to this, under date of October 11, she refers to her letter deferring the matter of sale till her return, and informs them that her daughter would be in Washington in a few days and would call to see them.

Complainants' bill sets out the letter of Mrs. Hildreth of July 20, 1890, and the contract of sale made by Pitney & Bradford, as agents, with Stevens, and alleges that they were her agents to sell and contract. They tender payment, and pray for a decree compelling performance by the defendant. The contract made with Mrs. McLinden and the assignment of same to complainant, Stevens, are not set out; but complainants pray now that they may be allowed to amend their bill to include the same if, in the opinion of the court, it might become necessary.

The answer denied the agency of Pitney & Bradford and their authority to contract for the sale of the premises, as well as any ratification of their alleged contract. The bill was dismissed, with costs, and complainants have appealed.

*Mr. R. Ross Perry* for the appellants :

1. When an offer of purchase is made and accepted by the posting of a letter of acceptance, before a notice of withdrawal is received, the contract is not impaired by the fact that a revocation had been mailed before the letter of acceptance. *Patrick* v. *Bowman*, 149 U. S., 411 ; *Taylor* v. *Merchants' Fire Insurance Co.*, 9 How., 390 ; *Byrne* v. *Van Tienhoven*, 5 C. P. D., 344 ; *Stephenson* v. *McLean*, 5

Q. B. D., 346; *Adams* v. *Lindsell*, 1 B. & Ald., 681.; *Dunlop* v. *Higgins*, 1 H. L. Cases, 381; *Harris' Case*, 7 L. R. Ch., 587; *The Palo Alto*, 2 Ware, 343; *Wheat* v. *Cross*, 31 Md., 99.

2. Mrs. McLinden, by her assignment to Stevens, vested in him (and, through him, in the plaintiffs) the right to have this contract specifically enforced. In such case where the assignment is absolute, and the assignor retains no equitable interest, such assignor need not be made a party. *Brace* v. *Harrington*, 2 Atkyns, 238; *Trecothick* v. *Austin*, 4 Mason, 41; *Whitney* v. *McKinney*, 7 Johns. Ch., 144; *Miller* v. *Bear*, 3 Paige's Ch., 467; *Colerick* v. *Hooper*, 3 Ind., 316; *Miller* v. *Whittier*, 32 Maine, 203; *Currier* v. *Howard*, 14 Gray, 511.

None of the exceptions, stated in § 202 of Fry on Specific Performance, to the assignability of contracts in equity applies here.

That Mrs. McLinden in fact assigned is not disputed. Nor can it be alleged that her contract was legally rescinded. Mr. Fry says at § 1004: " But the court must be satisfied of this total abandonment *by both parties to the contract.* ' The court,' said Lord St. Leonards, ' requires as clear evidence of the waiver as of the existence of the contract itself, and will not act upon less.' And in another case his lordship said that, unless a party has by his conduct forfeited his right, ' abandonment of a contract, according to the law of this court, is a contract in itself;' and accordingly he refused to hold a loose conversation which was alleged as a waiver of a contract for a lease to amount to such a new contract." *Bellamy* v. *Debenham*, 45 Ch. D., 481; *Carolan* v. *Brahazan*, 3 Jones & La Touche, 200; *Whittaker* v. *Fox*, 14 W. R., 192; *Harrison* v. *Brown*, 14 W. R., 193, *n.*; *Clifford* v. *Kelly*, 7 Ir. Ch. R., 333; *Cartan* v. *Bury*, 10 Ir. Ch. R., 404; *Moore* v. *Crofton*, 3 Jones & La Touche, 438, 445.

3. Perhaps the answer to the question, *Who could accept Mrs. Hildreth's offer and sue upon such acceptance?* is fur-

nished by the answer to this further question: To whom did Mrs. Hildreth mean to sell her property for $17,000 cash when she wrote her letter of July 20? Was it not an offer to sell to any one who would pay $17,000 cash for it? The only limitation that can possibly be placed on it is that the offer must be accepted through Pitney & Bradford.

At page 840 of volume 3 of the Am. and Eng. Ency. of Law, under the head of " Contracts," this statement is made: " A proposal need not be made to an ascertained person, but no contract can arise until it has been accepted by an ascertained person." (Sir W. Anson's work on Principles of the English Law of Contracts, p. 31, 3d ed.)

Familiar illustrations of this principle are offers of reward, a bid at auction, a general letter of credit, &c.

The examples given and the authorities cited in the notes on pages 846-7-8-9 of the Encyclopædia above quoted are so numerous that reference is here made to said pages.

Now Mrs. McLinden's acceptance of July 24 of Mrs. Hildreth's offer was either valid or invalid; if the former, we claim under the assignment; if the latter, then we, and not Mrs. McLinden, accepted Mrs. Hildreth's offer, and our acceptances of July 24 and of July 25 were notified to her by Pitney and Bradford's letters of July 24 and 26. See *Shuey* v. *U. S.*, 92 U. S., 73 ; *Freeman* v. *Boston*, 5 Met., 57 ; *Loring* v. *Boston*, 7 Met., 409 ; *Cummings* v. *Gann*, 52 Penn. St., 484 ; *Ryer* v. *Stockwell*, 14 Cal., 137 ; *Gilmore* v. *Lewis*, 12 Ohio, 285 ; *Crocker* v. *N. L. R. R. Co.*, 24 Conn., 261 ; *Janvrin* v. *Exeter*, 48 N. H., 83 ; *Jones* v. *Phœnix Bank*, 4 Seld., 228 ; *Fitch* v. *Snedaker*, 38 N. Y., 248 ; Bishop on Contracts (Chicago, 1887) § 322. Attention is especially called to the cases of *Ex parte Asiatic Banking Corporation*, L. R., 2 Ch. Appeals, 391 ; *McKune* v. *Joynson*, 5 C. B. N. S., 218.

4. It seemed to be the opinion of the court below that this was the ordinary case of property placed in the hands of a real estate broker for sale and of a sale *by him* by virtue of the fact that the property had been so placed in his hands.

In other words, the lower court thought that the case came within the authority of *Ryon* v. *McGee*, 2 Mackey, 17 ; and of *Hamilton* v. *Cutts*, 6 Mackey, 208. Inasmuch as the decisions in these cases related only to the effect of a general authority to sell, while the case at bar touches a specific offer to sell by the owner accepted by the intending purchaser, argument, upon the irrelevancy of these decisions, would seem superfluous. It is submitted, however, that those cases are not sound, and it is to be hoped that this court will promptly, upon occasion, reverse judicial legislation which, from supposed reasons of public policy, overturns well-settled principles of law in order to remedy a transient abuse.

In Massachusetts it has been always held that a written authority is not necessary in order to enable an agent to sign, for his principal, a contract required by the statute of frauds to be in writing. *Shaw* v. *Nudd*, 8 Pickering, 9.

In the case of *Valentine* v. *Piper*, 22 Pickering 92, Shaw, C. J., said: "Where the term 'sale' is used in its ordinary sense, and the general tenor and effect of the instrument is to confer on the attorney a power to dispose of real estate, the authority to execute the proper instruments required by law to carry such sale into effect is necessarily incident." See also *Hawkins* v. *Chace*, 19 Pickering, 502. It follows from these that in Massachusetts a real estate broker may be given by parol a general power to sell, and that this general power will include the power to sign a binding contract of sale in behalf of his principal. See *Hunt* v. *Gregg*, 8 Blackf., 105 ; *Vanada's Heirs* v. *Hopkins' Adm'r's*, 1 J. J. Marshall, 285 ; *Yerby* v. *Grigsby*, 9 Leigh, 387 ; *Doty* v. *Wilder*, 15 Ill., 407 ; *Johnson* v. *Dodge*, 17 Ill., 433 ; *Peabody* v. *Hoard*, 46 Ill., 242 ; *Long* v. *Hartwell*, 5 Vroom, 116, 121. Against these authorities of recognized weight there are a number of very recent decisions of Western courts. For the convenience of the court a list of them is here given. *Duffy* v. *Hobson*, 40 Cal., 244 ; *Treat* v. *De Celis*, 41 Cal., 202 ; *Rutenberg* v. *Main*, 47 Cal., 219 ;

*Armstrong* v. *Lowe*, 76 Cal., 617 ; *Grant* v. *Ede*, 85 Cal., 418 ; *Malone* v. *McCullough*, 15 Colorado, 460 ; *Sullivan* v. *Leer* (Col.), 29 Pacific R., 817; *Stillman* v. *Fitzgerald* (Minn.), 33 N. W. R., 564 ; *Graves* v. *Horton* (Minn.), 35 N. W. R., 568 ; *Carstens* v. *McReavy*, 1 Washington State, 359.

Of these cases the parent is *Duffy* v. *Hobson*, 40 Cal., 244. The ablest of them is the last, *Carstens* v. *McReavy*, 1 Washington State, 359; the opinion in this case judicially adds to the statute of frauds, but this no court can properly do. In addition are the cases of *Milne* v. *Kleb*, 44 N. J. Eq., 378 ; *Kramer* v. *Blair*, 88 Va., 456 ; *White* v. *Templeton*, 79 Texas, 454. Of these only the first coincides with the Western cases. But of all these cases, as well as of the English cases, *Godwin* v. *Brind* (Francis), L. R., 5 C. P., 299 ; *Hamer* v. *Sharp*, L. R., 19 Eq., 108, it is carefully to be noted that, to the extent that they decide that *an employment to find a purchaser is not an employment to sell*, they are undoubtedly in harmony with all authority. Only this is decided by the English cases. To the extent that any of them decides that a general employment to sell is necessarily an employment only to find a purchaser, they afford a most conspicuous example of unauthorized and vicious judicial legislation. In this connection the court is asked to compare the cases of *Pringle* v. *Spalding*, 53 Barbour, 17, and *Carstens* v. *McReavy*, 1 Washington State, 359.

We submit that the law of this jurisdiction to-day is that an owner of real estate may employ a man, whose business it is to sell real estate, by such language or even by such action as would create such employment in the case of any other sort of property. Further, we assert that no extraordinary form of language, method of action, or rules of law apply in such case, and that if the language used, or the acts performed, would, *mutatis mutandis*, authorize the sale by such person so employed of a horse of the employer, they will equally authorize the sale of a house. If it be necessary to extend the statute of frauds or to put a distinctive and opprobrious brand upon real estate brokers, let the legislature do its duty.

*Messrs. Phillips & McKenney* and *Mr. J. J. Darlington* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

Pitney & Bradford were strangers to Mrs. Hildreth, and learned from some outside source—probably from the advertisement of Hill & Johnston—that her property was for sale. Believing that it was cheap at $18,000 (as Baumgrass testified), they, acting in the interest of their client, Mrs. McLinden, wrote this letter of July 17, 1890, making the offer of $17,000, part cash and part credit, with a deduction of 3 per cent. as a commission to themselves. From her reply it appears that Mrs. Hildreth was willing to take $17,000, all in cash, for the house and lot. She said: " I will accept " that sum; but did not in express terms constitute them her agents and empower them as such to enter into a contract of salè binding upon her with any purchaser they might find. The words, " I will accept," as used in her letter, no more than the words, " I will sell," can be held as expressly saying, " I authorize you to contract for sale with any purchaser you may find." *Stillman* v. *Fitzgerald*, 37 Minn., 186 ; *Bosseau* v. *O'Brien*, 4 Biss., 395 ; *Grant* v. *Ede*, 85 Cal., 418 ; *Kramer* v. *Blair*, 88 Va., 456 ; *Bissell* v. *Terry*, 69 Ill., 184.

The letter of Pitney & Bradford clearly indicated that they represented a proposed purchaser, on whose behalf they wrote; and she, declining the offer, indicated her willingness to accept a certain price if offered. If, on behalf of Mrs. McLinden, they had promptly replied to Mrs. Hildreth's letter, accepting her terms, they might thus have made a binding contract between them. The point is in fact made incidentally, that acting as agents for Stevens they accepted this offer for him, and we will refer to this later. The main contention is, that the effect of Mrs. Hildreth's letter was to constitute Pitney & Bradford her agents, with full power to make a contract of sale at her price, which she can be compelled to perform. That Mrs. Hildreth

(without regard to the legal effect of the correspondence) did not so intend as a matter of fact, we think, is apparent. She immediately wrote to her niece to ascertain who Pitney & Bradford were, and also to enquire who the proposed purchaser might be. As soon as she received the letter of the 26th, in which Pitney & Bradford informed her that the sale could be concluded in thirty or sixty days, she wrote them she would do nothing about selling until she should return in the fall. They did not tell her niece, nor write her, that they had entered into a written contract of sale, in her name, on the 24th, and received a deposit on account of the purchase money. The niece, in obedience to her aunt's request, called to see them on the 24th, the very day that the contract bears date. Instead of telling her they had made a contract with Mrs. McLinden, and that nothing remained to be done but to execute it by deed and delivery of possession within thirty days as stipulated in said contract, it would seem that they misled her. We say, "it would seem," because, in her letter to her aunt, written on the next day, she gives an account of her interview, and says: "By this post you will probably receive a letter from him ( Pitney) saying that the applicant, a Mrs. McLinden, would take your house at $17,000 cash." She then refers to the anxiety of the "applicant" to obtain almost immediate possession, and suggests that if "she can't get possession at once, the sale may fall through;" she then adds: "If she has to wait until October for your return to get in the house, she will probably look elsewhere, so you had better come and settle it." Mrs. Hildreth did not accept the suggestion, but wrote her niece that she would defer the matter of sale until her return in October, and asked her to so inform Pitney & Bradford. The information was given as requested. About the same time she wrote her short letter to them of the same effect. Notwithstanding all this, not one word was said to her of the existence of the contract with Mrs. McLinden, or of the second one made with Stevens.

Instead of being the agents, in the true sense of the word, of Mrs. Hildreth, Pitney & Bradford may well be considered the agents, first of Mrs. McLinden, and then of Stevens. Everything they did was in the interest of the proposed purchasers. They thought the property a good investment at $18,000, and yet, instead of trying to obtain that price (or more, as they should have done if really representing the interests of the owner), their sole effort was to obtain a reduction on behalf of the conflicting interest of the buyers. An agent's duty is to obtain the best price that he can for his principal, and scrupulously to avoid placing himself in a situation which may conflict with this duty. And any attempt to occupy the relation of agent to two persons whose interests conflict, whether with or without notice to them, is to be condemned as contrary to good morals and the principles of equity.

In the interest of Stevens, who had shown extreme anxiety to obtain the property at the price, they, without consulting Mrs. Hildreth, permitted Mrs. McLinden to withdraw, and substituted him in her stead. They antedated the contract with Stevens so as to make it correspond with the date of the original notice to Mrs. Hildreth of sale, viz., July 24th; and had the cheque of Stevens for the deposit to correspond in date also. Again, some days afterwards, though the exact date could not be given by the parties who ought to have been able to do so, they procured the pretended assignment of her contract by Mrs. McLinden to Stevens. We say pretended assignment, because this contract had been set aside and Mrs. McLinden's deposit cheque returned when the contract with Stevens was made. No attempt was made to purchase her option before its cancellation, and afterwards she had nothing left which she could assign. This assignment was plainly an afterthought, and a device by which it was sought to strengthen the claim of Stevens in an expected controversy with Mrs. Hildreth.

Anticipating that Pitney & Bradford might be regarded as the agents of Stevens instead of Mrs. Hildreth, the point

has been made, as we have mentioned above, that the letter of Mrs. Hildreth contained a proposition to sell for $17,000, which they, as agents of Stevens, accepted, thereby making a contract which may be enforced, though relief be denied upon the main contention. The answer to this is plain. The only acceptance of the offer was on behalf of Mrs. McLinden, and Mrs. Hildreth was so informed through her niece on the same day. The proposition, as such, was never in fact accepted by Stevens. To make acceptance of an offer form a contract, the parties making the offer must have notice thereof in a proper manner before its withdrawal. No such notice was ever given. It is not necessary to inquire whether, had there been a formal acceptance, the proposition was sufficiently definite to be good under the Statute of Frauds.

But whether Pitney & Bradford are to be treated as the agents of Stevens or of Mrs. Hildreth, or of both, their conduct has been such, at least within the knowledge of Stevens, as would make it inequitable to enforce the specific performance of the alleged contract. In the exercise of a sound discretion, courts of equity will always decree specific performance in plain cases of contract, and have no right to refuse it arbitrarily or capriciously; but they will never do so when, independent of the contract, circumstances are developed which would render it unjust, or tend in the slightest degree to encourage deception.

The decree passed below must be affirmed upon the other and chief ground upon which it has been assailed, viz., that the correspondence between Mrs. Hildreth and Pitney & Bradford did not confer upon them the power to enter into a contract of sale of her property, which, without ratification, would bind her.

That power to sell real estate does not include the power to make a contract therefor, has been expressly held, in two cases, by the Supreme Court of this District. *Ryon* v. *McGee*, 2 Mackey, 17, decided in 1882; and *Hamilton* v. *Cutts*, 6 Mackey, 208, decided in 1887. Both of these

cases were cited with approval in the later case of *Armes* v. *Cameron*, 19 D. C., 435 (1890).

The want of care, if any, displayed by Mrs. Hildreth, in her original letters, as well as in subsequent correspondence, in not expressly excluding any such power, may well be explained by the circumstance that these decisions had made a rule of practice or construction, presumably well known to owners and buyers as well as to brokers and agents within the District of Columbia. The soundness of these decisions has been challenged in an argument which ably presents the other side, and is supported by high authority. The question has been the subject of much dispute and the conflict of authority is irreconcilable. As the decisions which have been assailed have necessarily had their effect upon the relation of owners of real estate and brokers in their dealings with each other in this jurisdiction, we would not feel justified in overruling them in case we doubted their soundness. But we are not satisfied to uphold them upon that ground alone. The doctrine which they enounce meets with our approval. It is not unsound in principle, accords with true public policy, and is supported by highly respectable authority. *Duffy* v. *Hobson*, 40 Cal., 244; *Grant* v. *Ede*, 85 Cal., 418; *Carstens* v. *McReavy*, 1 Wash. St., 359; *Stewart* v. *Pickering*, 73 Iowa, 652; *Morris* v. *Ruddy*, 20 N. J. Eq., 236; *Milne* v. *Kleb*, 44 Id., 378; *Malone* v. *McCullough*, 15 Col., 460; *Fisher* v. *Bowser*, 41 Tex., 222; *White* v. *Templeton*, 79 Id., 454; *Simmons* v. *Kramer*, 88 Va., 411; *Kramer* v. *Blair*, Id., 456; *Bosseau* v. *O'Brien*, 4 Biss., 395; *Stillman* v. *Fitzgerald*, 37 Minn., 186; *Graves* v. *Horton*, 35 N. W. Rep., 568; *Hamer* v. *Sharp*, L. R., 19 Eq., 108. The reasoning of these cases is, to our minds, cogent, and leads to conclusions essentially just.

The agent thus constituted is under no contract with his principal to sell, is charged with no duty in the premises, and liable for no negligence. He may throw up the business at any time without notice without being liable for neglect or omission of duty. He becomes entitled to his commis-

sion when he shall have procured a purchaser at the owner's price and terms who is ready to close and able to perform the contract.

Real estate brokerage is an extensive business that within a few years has grown into colossal proportions. Real estate speculations throughout the whole country have brought into existence a host of brokers, who buy and sell for owners, resident and non-resident. We cannot ignore the universality of the business, the manner in which it is conducted, the customs prevailing in buying and selling, nor the evils of litigation which arise out of it. It is a well-known fact that persons who desire to sell lands or lots place them in the hands of two or a dozen brokers, with the understanding that the one who first finds a purchaser to the owner's satisfaction shall receive the commission. It would be opening the door to frauds and perjuries and endless litigation to extend the power to sell into anything more than a commission to find a purchaser at the owner's terms, with right to compensation for services should he, without legal excuse, refuse to complete the sale.

The agency to *sell*, though created by writing duly signed, has never been deemed sufficient to authorize the agent to make a deed or a title good at law; the authority to do so must be formal and express. Then why, upon such limited agency, permit him to enter into a contract which a court of equity, through its process, will ripen into a perfect title? Why should not the power of the agent to act cease in equity where it ceases at law?

" He stops short somewhere, and when we are inquiring where the probable and proper place of his stoppage is, the evils that would attend the extension of his actual authority beyond the finding of a purchaser furnish ample reason for fixing his limit there."

" An agency of this kind may be created by the slightest form of words without any writing, leaving it to litigation to determine whether the substance of the authority is ' to sell ' or ' to find a purchaser,' wherein the unscrupulous and

dishonest agent would be at once arrayed, as the principal witness against his client, with every advantage from some note, 'made at the time,' of what the instruction was. Perjury would go at a premium in such cases, and the confiding and unlettered would be the victims. Scarcely any man, when listing his property with a real estate agent, stops to give details, either as to the property itself or as to the arrangements he desires to make, yet no one would sell upon equal terms to a first-class business man, and to an habitual drunkard, or well-known insolvent, and the ordinary man would not sell at all to a person whose very occupancy would tinge the neighborhood with a bad repute. These are good reasons, and are probably some of the reasons why custom and the law have made it not necessary that real estate agents should actually procure contracts in order to earn their compensation, and why, in this connection, the common understanding of the phrase 'authority to sell' means only authority to find a purchaser, whether the authority be given orally or by written request." Stiles, J., in *Carstens* v. *McReavy, supra.*

The facts of this case, we think, forcibly illustrate the wisdom and justice of the rule of strict construction which requires that, whether verbal or written, "the words used for the purpose should be distinct and clear in their meaning and import, and should, with the requisite degree of certainty, manifest the intention of the principal to do something more than merely to employ a broker." *Duffy* v. *Hobson*, 40 Cal., 245.

It is not necessary to pass upon the application for leave to amend the bill in this court so as to include in the cause of action the claim under the assignment from Mrs. McLinden; for it must be apparent from what we have said with respect thereto, that had it been included in the allegations of the original bill, it would afford no ground for the relief prayed.

No error appearing in the proceedings below, *the decree dismissing the bill must be affirmed with costs to the appellee ; and it is so ordered.*