# NATIONAL SAVINGS & TRUST COMPANY *v.* SANDS.

REAL ESTATE AGENTS; FRAUD; ACCOUNTING; COMMISSIONS; INTEREST; PARTNERSHIP; JOINT OBLIGORS.

1. A court of equity will not tolerate the surreptitious taking by a real estate agent of double commissions, or the trading of the principal's property for property in which the agent is either secretly interested as owner or agent, or in what is known as triangular deals, whereby the title passes through a dummy or straw man for the purpose of piling up commissions and concealing the real facts relating to the transaction, or any position assumed by the agent which is even

Note.—For cases passing upon fraud and secret dealings of real estate brokers, as affecting their commissions, see note to *Leathers* v. *Canfield,* 45 L.R.A. 33.

The authorities passing upon liability of partnership for torts of individual member are reviewed in the note to *Page* v. *Citizens' Bkg. Co.* 51 L.R.A. 469.

D. C.]                    Statement of the Case.

remotely antagonistic to the principal, or any concealment from the principal by the agent of any transaction conducted by the agent relative to the agency. (Citing *Dahlgren* v. *Story*, 39 App. D. C. 29; *Forrest* v. *Wardman*, 40 App. D. C. 520, and *Fox* v. *Patterson*, 43 App. D. C. 484.

2. Where, in a suit in equity for an accounting against a firm of real estate agents who had had charge of the plaintiff's property for several years, collecting the income, paying the taxes and insurance and other expenses, and looking after the property generally for an agreed commission, it appeared that during the agency the plaintiff's properties were sold, traded, and rented, and the proceeds and title were so treated that the plaintiff was not only defrauded of large amounts of money, but the properties were bartered by the defendants in such manner that they received large profits and commissions which should have accrued to the plaintiff, a decree was *affirmed* which found certain sums to be due the plaintiff, the exact amount of which could be ascertained without an accounting, together with compound interest thereon until paid, and awarded execution therefor, and 'directed an accounting by the defendants of all rents and profits received during the agency, and for the full value of the plaintiff's properties disposed of by them, allowing credit for sums paid to the plaintiff, and disallowing the defendants any commissions or fees as agents, and further directing that the defendants should be charged with every sum of money due to the plaintiff as of the date when it became payable, with interest, and that annual balances should be struck and interest allowed thereon.

3. In a suit for an accounting, the members of a copartnership firm of real estate agents will be held jointly and severally liable to the principal for fraud, where the agency was with the firm, although some of the fraudulent transactions were conducted personally by one of the members of the firm.

No. 2783. Submitted April 27, 1915. Decided June 1, 1915.

Hearing on an appeal by the executor of the will of one of two defendants, and also by the other defendant, from a decree of the Supreme Court of the District of Columbia in a suit for an accounting against a firm of real estate agents. *Affirmed.*

The Court in the opinion stated the facts as follows:

This suit in equity was brought by appellee, Margaret Sands, in the supreme court of the District of Columbia against Early

and Lampton, real estate agents, for an accounting as to various transactions growing out of the management of plaintiff's real estate by defendants between the years 1904 and 1908.

It appears that Early & Lampton were partners in business during the period here involved; that in October, 1904, plaintiff placed certain of her real estate in the hands of defendants for the collection of rents, and that, on February 7, 1905, she made a contract with defendants whereby they were to take general charge of her property, collect the revenues therefrom, pay taxes, insurance and all expenses, and look after the property generally, for a commission of 5 per cent. A review of the multitude of transactions involved under this agency discloses that property was sold, traded, and rented, and the proceeds and title were juggled by defendants in such manner that plaintiff was not only defrauded out of large sums of money, but her real estate was bartered away in such manner that defendants received large profits and commissions which should have accrued to the benefit of plaintiff.

We deem it unnecessary to enter into a detailed statement of the numerous transactions involved in this controversy. They have been so clearly stated and analyzed in the able opinion of the learned trial justice below that his statements and conclusions may be adopted as a correct analysis of the law and facts in this case. The summary in his opinion of his findings and conclusions appears in full in the footnote.[1]

---

[1] The case was calendared for the October term, 1913, and was heard upon the pleadings and testimony, being argued by counsel both orally and in briefs afterwards filed, and having been duly considered, is now to be decided.

1. The sale to Kehoe.

This sale was negotiated on the part of the plaintiff by Early & Lampton. Their relation to the plaintiff was that of agents, bound to look only to her interest. She had no reason to suppose that they were representing any interest but hers, no reason to be on her guard against their representations. They led her to believe that the deal was between herself on the one part and Kehoe on the other, that on her side she was giving the equity in "Mintwood," that on his part he was giving

A decree was entered requiring defendants to account for all the rents and profits received during said agency, and to account for the full value of plaintiff's real estate disposed of by defendants, allowing credit for sums paid to plaintiff di-

the equity in 1620 Eighteenth street, the equity in the Margaret, a certain amount in notes, and a certain amount in cash. This was not the fact. Instead of giving the equity in the Margaret and a certain amount in cash which they represented to her, he was giving a different amount in cash, and out of that amount they were buying for her an equity in the Margaret from Norment, acting as agents for Norment in thus selling the Margaret to her, as well as agents for her in buying it. They concealed from her the fact that they were buying the Margaret for her from Norment, and the fact that they were selling to her the Margaret for Norment. This, of course, they had no legal right to do. They were bound to disclose to her the real transaction and the whole of it. *Dahlgren* v. *Story*, 39 App. D. C. 29, 34. Kehoe offered to give for the equity in "Mintwood," (1) the equity in 1620 Eighteenth street and (2) $20,-000 in cash or its equivalent in secured notes. This proposition was made to Lampton through Bradford, who was Kehoe's agent. Instead of submitting this proposition to the plaintiff, Lampton and Bradford put in writing a different proposition, which was submitted to the plaintiff and accepted by her, *viz.:* The equity in 1620 Eighteenth street, the equity in the Margaret, $5,000 in cash, and $8,500 in secured notes. The mortgage on Mintwood was, in this writing, stated to be $32,500 instead of $32,000, as it turned out to be, so that the cash offer was in fact $5,500 instead of $5,000. The defendants contend that the plaintiff had the option of taking the $20,000 in cash and notes, or of taking the equity in the Margaret with $14,000 in cash and notes, and that she chose the latter. The evidence, however, convinces me that this is not the truth, and that Lampton, for Early & Lampton, dragged in the Margaret, as before stated, thinking to make the proposition attractive through his representations of the value of the Margaret, and for the sake of carrying through the deal with Norment. The result was that $6,000 which the plaintiff might have had in cash or its equivalent, and which her agents did receive, and which belonged to her, she remained ignorant of, receiving $8,500 in notes, and $5,500 in cash, while her agents put off upon her the equity in the Margaret instead of the $6,000. That the real offer from Kehoe was of $20,000 in addition to the equity in 1620 Eighteenth street is shown by the receipt dated October 10, 1904, from Kehoe to Bradford, where the terms of the offer are stated. Including the deposit of $1,000 the sums to be paid aggregate $19,500, and the error in the statement of the amount of the trust, before referred to, makes up the $20,000. Early & Lampton thus foisted upon her the equity in the

rectly or on her order, and disallowing defendants any commis-
sions or fees in connection with such agency. The court
referred the case to the auditor to state the account, with the fol-
lowing instruction: "In stating the accounts, the auditor will

Margaret in place of $6,000 which she had a right to receive. Less than
two months later they paid off the second trust on the Margaret of
$2,000, with interest, which had still nearly three years to run, and
which she was under no obligation to pay; the trust notes having been
signed by Early & Lampton's straw man Evans for the express purpose,
as they say, of avoiding any assumption of liability on her part, thus
making her to pay for the Margaret $2,000, and interest, in addition to
the $6,000; and some three years later Norment forecloses his other mort-
gage and buys in the Margaret for $10,000, not for $11,000, as erroneous-
ly stated in the pleadings. To make this prepayment of the second trust
on the Margaret, it was necessary for them, according to their showing,
to advance to her $750 and take her note therefor; so that it is not
true, as stated in their answers, that she had ample funds in their hands
to pay it off. The circumstances are strongly suspicious that Early &
Lampton were acting throughout in the interest of Norment. At any rate,
they were not acting in the interest of the plaintiff, as they were bound to
do.

The Margaret should therefore be treated in the accounting as their
own risk. She should be credited with the $6,000 which she was entitled
to have received in lieu of it, and which the defendants did receive as her
agents, with the $2,014.03 unnecessarily paid by them to remove the sec-
ond trust, and should be allowed to retain the net income therefrom dur-
ing the time the title remained in the plaintiff, and be allowed the small
sum ($81.46) paid to the plaintiff by Norment out of the proceeds of a
resale made by him after the foreclosure sale. The Margaret should be
treated as the defendants' property; the $6,000 should be treated as the
plaintiff's property; the $2,014.03 should be treated as money of the plain-
tiff expended by the defendants for their own purposes. The defendants
should be charged as well with the commission of $1,500 which they re-
ceived from the proceeds of the sale of "Mintwood." Having violated
their duty in the transaction and conducted it in their own interest, and
for their own purposes, they should be treated as working for themselves
and entitled to charge no one but themselves for what they did.

The result thus reached is not rendered less equitable by the facts that
the money actually received by Lampton from Bradford was $500 and a
check for $6,739.11 clear of all interest, taxes, and other adjustments,
making $7,239.11 in all, and that neither Bradford nor the defendants
could show how these moneys were disposed of. The amount paid Nor-
ment in cash after adjustments appears to have been only $3,117.57. No

charge said defendants with every sum of money due by said defendants to the plaintiff as of the date when such sum became due, together with interest at the rate of 6 per cent per annum from the date when it became due to January 1st next follow-

book was ever kept by Early & Lampton showing the profits or commissions of the firm, as Early himself testified.

The contention that the plaintiff's father knew all about the transaction is not borne out by the evidence. Nor is their contention that the plaintiff relied upon her father in any way that lessened or qualified their duty to her as her trusted agents bound to safeguard her interests at every point, and charging her a 3 per cent commission upon $50,000 as their pay for so doing.

The defendants should also account for the moneys of the plaintiff which have been expended by them in relation to the Margaret in excess of what she has received therefrom, during the period of her apparent ownership, if there be such an excess.

2. The supposed exchange of 1620 Eighteenth street and 1867 Mintwood for the Winchester.

This was the next of the large transactions, in order of time, and took place in March, 1905. The defendants represented to the plaintiff that they were merely exchanging said properties, each subject to the encumbrances thereon. What they really did was to buy of Harper the Winchester at $24,100,—$20,000 being represented by trusts thereon, and $4,100 being in cash,—and to sell 1620 Eighteenth street to another party at $16,000, subject to the trust of $12,000 resting upon it, and 1867 Mintwood to still another party at $9,850, subject to a trust of $7,500. They never disclosed to her the actual transaction, but concealed the facts for their own purposes. In the statement which they rendered to her, pretending to state the transaction as it was (Exhibit C to Early's answer), they treated the Winchester as of the value of $32,000, subject to trust of $20,000, and treated 1620 Eighteenth street as worth, above its trust, $7,500, and treated 1867 Mintwood as worth, above its trust, $4,500; and charged her with a commission of $500. This statement misrepresents the transaction as a straight exchange of the properties, and conceals the facts which would have shown what the defendants actually received. Their treatment of their principal amounted to a fraud upon her,—a wrongful conversion of · her properties,—and entitles her to re· pudiate the transaction, as she desired to do, and to recover the actual value of the properties with which she parted. *Forrest* v. *Wardman*, 40 App. D. C. 520.

She has a right, if she sees fit, to have the prices at which the defendants sold the properties treated as their true values, for the defendants

ing, the sum itself, together with such interest, to be then included in the then general annual balance of the accounts to be stated by the auditor. Each general annual balance of accounts shall cover and include, as a part thereof, interest at

have actually received those amounts, or to establish by other evidence the fact of the actual values, if she believes said prices too low.

The Winchester, then, is no longer to be treated as her property, and whatever was expended upon it by the defendants out of her moneys, in excess of what they turned back to her upon the same account, is to be credited to her and charged to the defendants. Of course, the defendants are not entitled to any commission in connection with the so-called exchange, or their subsequent dealings with the Winchester.

The defendants are also to be charged with the $375 check received from the plaintiff October 28th, 1904.

But the plaintiff electing to repudiate the purchase of the Winchester and recover the value of the properties with which she parted in that transaction, with interest thereon as may be allowed, and to be credited with the net amount expended by the defendants upon the Winchester as having been expended not upon her property, but upon theirs, it will not be necessary to pursue the further dealings of the defendants with the Winchester upon the theory that the Winchester was and remained hers; for that would be inconsistently treating the Winchester as not hers and also as hers, although she did have the right to go into both subjects in order to ascertain the true state of affairs, not only to reveal the methods adopted by the defendants in conducting her business, but also that, when discovery had been made, she might elect whether to repudiate or not.

3. The $3,500 Kehoe note and its proceeds.

This note, as we have seen, was given by Kehoe as a part of the consideration for "Mintwood," and was secured on that property. It was not due until December 10th, 1905. The plaintiff's testimony is that in March, 1905, Lampton urged her to let him borrow $2,000 on it for the purpose of going into a real estate deal in which he was sure of making a large profit within ninety days, and told her that he could pay her within that time a thousand and possibly fourteen hundred dollars; that she and her mother were present and both were reluctant to allow this use of the note; that Lampton assured them that there could be no real risk because Early was a man of large means. They understood that Lampton was speaking as a member of the firm, and never considered that they were dealing with him in any other capacity; that the plaintiff yielded to his importunities, and by his direction withdrew the note from the bank where it had been left for safe-keeping, indorsed it, and put it in his hands; that she asked him afterwards about the investment and

six per cent per annum upon the preceding general annual balance." Jurisdiction of the cause was retained for "further proper decrees or orders upon the coming in of the report of the Auditor." Final judgment, with execution therefor, was

---

was told that the first deal had fallen through, but that some people had just left the office who expected to buy the property, and without doubt it would soon be carried through; that she kept inquiring, but was always put off by evasive answers; that Lampton had given her a receipt for the note, but she lost it; and in May, 1906, the investment deal being still incomplete, as Lampton informed her, and she being about to sail for Europe, Lampton gave her another receipt for it reading as follows:

Washington, D. C., May 29th.

Received of M. C. Sands $3,500 of Kehoe's,—a receipt was given at the time said note was given to borrow $2,000 to be use (sic) to purchase lots, she having one-half interest in said lots and to share in the profit of said lots.

James J. Lampton.

That the plaintiff and her mother sailed May 31, 1906, and did not return until August, 1907; that in October, 1906, the plaintiff had need of money to pay charges upon goods in storage in Washington and wrote to her cousin, Mrs. Malcolm, to get it from the interest on the Kehoe note held by Early & Lampton. Mrs. Malcolm testified to receiving the letter and that she went to Lampton and asked him for the money. He replied that he had no funds; whereupon she told him that according to the plaintiff's letter there was interest due upon the Kehoe note; and he then said he would go and see Kehoe and get it and that she might call the next day. When she returned he gave her a check for seventy and some dollars as such interest. I cannot doubt the substantial truth of this testimony of the plaintiff and Mrs. Malcolm, corroborated in part by the testimony of the plaintiff's mother and by the circumstances already and still further to be stated. The letters of the plaintiff and her mother during their absence in Europe contained repeated and insistent references to the Kehoe note, and to the representations upon which it had been intrusted to him, with demands upon him to return it to the bank. The correspondence shows that the plaintiff was relying upon the firm in respect to this note. The balance of it is in favor of the finding that the note was called to Early's attention also in this correspondence. At first he denied having received any letter whatever from the plaintiff from abroad, but a letter from him which was put in evidence acknowledges the receipt of the letter from her; and although notice was given to produce that letter with any others he had received from her, he failed

entered for certain sums, the exact amount of which could be ascertained without further accounting, together with compound interest thereon from the respective dates thereof, until paid.

---

to produce any. She thinks she wrote him two letters and that she mentioned the Kehoe note. It would have been natural that she should do so for it was troubling her mind; she was in sad need of funds where she was, and I cannot doubt that she regarded the firm as responsible for it. The case shows that Early was capable of dealing unfairly with his principal, and in one instance was not above attempting to intimidate a witness from attending in the case, by the use of an anonymous threatening post card. I think the fair inference is that the letter he acknowledged receiving from the plaintiff would have been produced if it had not contained the reference to the Kehoe note which the plaintiff thinks it did. Lampton, while never explaining the use he had made of the note, told the plaintiff that it was intact, and as late as November, 1907, paid money to the plaintiff and her mother as and for interest thereon. Lampton was the member of the firm best known to the plaintiff and with whom most of her interviews and correspondence were had. When she called at the office, if she saw Early and made any inquiry he customarily referred her to Lampton. Lampton had no separate office or business so far as appears. I think the plaintiff in all the circumstances was fairly justified in supposing, as she did suppose, that the transactions regarding this note were transactions with the firm; that they came fairly within the scope of the partnership business and agency, and were binding upon the firm.

When the plaintiff's counsel, soon after his employment in December, 1907, endeavored to get from Early & Lampton some explanation of this note transaction, he was referred by Early to Lampton, and from Lampton could get nothing but a reference to various check stubs and bills, which he claimed represented the proceeds of the note as paid for the plaintiff's benefit, but which altogether amounted to only a few hundred dollars. It will not be forgotten that in his answer Lampton stated that the proceeds were used to pay debts of the plaintiff, paid by her direction, and paid about the time the note was collected, of all which, he said, she had knowledge. Long after he had collected the note from Kehoe, he gave the plaintiff a receipt for it, which is in evidence, and which states that it was to be used for an entirely different purpose. As a matter of fact, Lampton collected the note on March 31, 1905, long before it was due, and accepted, in full, $3,200. There seems to be no escape from the conclusion that he wrongfully converted it. The defendants should be charged with the full amount of the note, and there is no reasonable doubt that it was worth its face value. Although the check of Kehoe for $3,200 was

*Mr. W. C. Clephane, Mr. Charles Poe,* and *Mr. J. J. Darlington* for the appellants.

*Mr. George E. Sullivan* for the appellee.

indorsed by the plaintiff, it is impossible to believe, in view of the subsequent treatment of the subject of the note by both parties, that she ever understood that the note had been paid and extinguished. It is much more probable that her indorsement was procured in some way that left her in ignorance of what was being done. The clearly established facts exclude the hypothesis that Lampton acted the part of an honest man in his dealings with this note, and his misconduct lends probability to the supposition that he imposed upon the plaintiff in the beginning. I am convinced that he wanted the money for purposes unconnected with the plaintiff's affairs, and made a heavy discount to get the note paid before it was due; that he induced the plaintiff to place the note in his hands by the foregoing representations as to the profit the firm could make for her, and that he concealed from her as long as he could the fact that the note had been extinguished.

The item simply constitutes another charge against the firm, and can be counterbalanced only by clearly proven items of credit. It may, however, be extinguished or reduced by such items, notwithstanding the wrongful nature of the conversion. It was in the transaction of business within the apparent scope of the partnership that the wrong was done, wherefore the charge is a proper one against the firm; but so far as the firm has paid money to the plaintiff out of the proceeds of this note, it should receive credit, for that is equity. The very claim that the proceeds were used in whole or in part to pay debts of the plaintiff and charges against her properties in the hands of the firm shows, however, how futile is the effort to separate this transaction from the other partnership transactions, and relieve Early from liability thereon. The fraudulent character of the defendants' dealings with the plaintiff, which appear repeatedly throughout this case, disentitles either of them to have items of credit found and allowed upon their uncorroborated evidence. They must establish every item by properly corroborated evidence, and must make the fullest disclosure of all sources of evidence within their power. Their position that they had already disclosed fully is shown to have been untrue, and their constant demand that the plaintiff should give them particulars of all claims of wrongdoing on their part is, in view of their studious and fraudulent concealment of the facts, not to be countenanced. They have covered the plaintiff's business from her sight, and now they profess to be greatly outraged by her refusal to tell them exactly what they have concealed. It is for them to show what they have concealed, the fact that they have concealed having been clearly shown in

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

This is a case where the court will not stop to dissect each particular transaction for the purpose of discovering whether

more than one instance, from which their disposition to conceal in others is but a natural and legitimate deduction. They must assume and bear the duty of such a rigid accounting as the law always imposes upon unfaithful stewards.

4. The $1,100 second trust on 1859 Mintwood.

The defendants Early and Lampton are to be charged with the full amount hereof, and credited with such amounts thereof as they can show inured to the plaintiff's benefit, in the accounting which they will be required to make. They are to be allowed no commission directly or indirectly.

5. The sales of 1859 and 1863 Mintwood.

The defendants sold 1859 to Smith for $9,750 on June 21, 1907, the purchaser assuming as a part of the price a trust thereon for $7,000. Their contract with the purchaser called for $750 cash and $2,000 in monthly $50 notes, with interest at 5 per cent. For the plaintiff they made a statement representing the sale to have been made for the price of $9,500, and charging their commission at $285. The suggestion is made by the defendants' counsel that the difference is probably to be accounted for by a discount upon the second trust notes, which they may have been compelled to allow in order to realize upon them. But this is a suggestion only. There is no evidence that such a discount was in fact made, still less that they were compelled to make it, and if it was made and was necessary it does not justify a misstatement to the plaintiff of the true price. The defendants must be charged with the actual price and must account for it in some proper way. Moreover, the evidence clearly shows that there was no discount, but that the $2,000 was paid in full. This appears from the testimony of Miller, the secretary of the title company, which disbursed the loan. Let the defendants therefore account for the price, $9,750, at which this property was sold, taking no commission thereon.

1863 Mintwood was sold by the defendants to James M. Baker in August, 1907, for $9,250. The evidence shows clearly enough that they never accounted to her for the proceeds in any proper way. They must do so now, taking no commission, and being allowed no commission as paid to any other agent, they having misrepresented the facts to her. The evidence upon the present record is not sufficient to enable the court to determine exactly the items of credit.

6. An accounting should be taken concerning the readjustment of the loan and trust upon the St. George. The defendants should be credited

or not there was concealment or fraud on the part of the agent. Fraud and concealment are so conclusively shown in many, if not all, of the transactions, that the whole agency is tainted, and equity will require a general accounting by the defendants

with the moneys actually and necessarily disbursed by them for that purpose. They should not be allowed any commission for procuring the loan. They have already waived any possible right to a commission for procuring insurance upon the property, which they had previously charged; hence that item is eliminated. The facts with reference to the payment of a commission to the American Security & Trust Company will be ascertained and reported by the auditor, and dealt with upon the coming in of his report.

7. The Navy Yard properties.

These transactions, so far as their alleged fraudulent aspects are concerned, came to light during the taking of the testimony, and were covered by an amendment to the amended and supplemental bill, as before stated.

April 7, 1906, the plaintiff deeded these four properties to one Hunter, one of which, it is admitted, was included by mistake, having been previously conveyed to other grantees. Hunter is claimed by the defendants to have been merely their representative. It is admitted that they sold part of the property to Cooper, part to Hoppin, and part to Christman, and that Hunter made the deeds to those purchasers respectively by the direction of Early & Lampton. The defendants' position is that they purchased the property from the plaintiff and paid her for it. Her position is that they sold it as her agent, having never accounted to her for it, and must now account. The defendants claim to have purchased the property of the plaintiff through one Stevens, a young man, a cousin of the plaintiff, who, they insist, was the plaintiff's agent in the transaction. Yet they admit having paid Stevens a commission of $325 for his services in the business, without letting the plaintiff know of it. The evidence, however, shows plainly that the defendants were not purchasers, but were acting as agents of the plaintiff, and bound by the usual obligation resting upon agents. The defendants' books show letter press copies of statements of the sale of these properties, which the defendants say were rendered to the plaintiff. They show each transaction as a sale made for her. They do not, however, report the facts truly, but misstate the prices at which the properties were sold. In the accounting which must be taken of these Navy Yard sales, the defendants are to be treated as agents, accountable for all that they receive, credited with no commissions, and allowed only such disbursements as are clearly proven to have been made and to have been necessary, and with such amounts as they show to have been paid to the plaintiff or for her benefit. In part payment for one of these properties the defendants accepted a certificate

for all transactions with plaintiff's property, whether by the firm or either of its members. It is sought to relieve Early from the responsibility of some of the transactions alleged to have been conducted personally by Lampton. The agency was with the firm, and the members of the firm will be held jointly and severally liable.

It may as well be understood by real estate agents that the courts will not tolerate the surreptitious taking of double commissions, or the trading of a principal's property for property in which the agent is either secretly interested as owner or agent, or in what is known as triangular deals, where the title passes through a dummy or straw man for the purpose of piling up commissions and concealing the real facts relating to the transaction, or any position assumed by the agent which is even remotely antagonistic to his principal, or any concealment from the principal by the agent of any transaction conducted by the agent relative to his agency. As we have said before: "The fiduciary relation established between the parties charged the defendants with a sacred trust, which demanded of them a complete, open, and frank disclosure to plaintiffs of every step taken in the transaction from the date of the creation of the agency until the transaction was finally closed.

---

of stock at $500. The defendants should be charged with the then actual value of this share, not, as the plaintiff claims, with its nominal value as treated in the trade.

The case will be referred to the auditor to take the accounting along the lines of this opinion, and to state the accounts between the parties. The defendants must account fully for all moneys or other property of the plaintiff coming into their hands, including all rents. They are to be credited with no commission upon rent. In short, they can receive no compensation for any part of their administration, but must be charged with the necessary expense of removing the effects of their maladministration, including reasonable counsel fees. They should be charged with interest at the legal rate upon the annual balances to be ascertained by the auditor. Upon the accounting the plaintiff will be allowed to trace as far as possible the misappropriated funds, and to have that branch of the case presented in the report.

                                        Wendell P. Stafford,
                                                Justice.

During that period defendants owed a duty to plaintiffs which forbade the placing of themselves in any attitude, however profitable, that would even appear to be antagonistic to the interests of plaintiffs, without first having secured their consent after a full disclosure. The practice of real estate agents in concealing from their principals the conditions upon which contracts of sale are procured cannot be too severely condemned. The name of the actual vendee, the true consideration, and every detail employed by the agent in bringing the parties together, should be promptly disclosed by the agent to his principal, and for failure to do so the courts will uphold the principal, not only in repudiating the transaction, but in recovering loss sustained by him or profit secured by the agent." *Dahlgren* v. *Story,* 39 App. D. C. 29.

The court in the present case has only required what equity demands,—a full accounting by defendants of the trusteeship, and, because of the frauds and concealment perpetrated upon their principal, a forfeiture of compensation or commissions. The decree is fully supported by the decisions of this court in *Dahlgren* v. *Story, supra; Forrest* v. *Wardman,* 40 App. D. C. 520; *Fox* v. *Patterson,* 43 App. D. C. 484.

The decree is affirmed with costs. *Affirmed.*