## DAHLGREN *v.* STORY.\*

### BROKERS; PURCHASE FOR RESALE; ACCOUNTING.

Real estate brokers acting for the vendor in a proposed sale of property, who, unknown to their principal, enter into an agreement with the prospective purchaser to acquire the property jointly with him, and personally guarantee him against loss by reason of failure to sell at a better price, with 5 per cent interest on the amount he invests, assume a position antagonistic to their principal, whether the agreement be construed as a contract for the purchase of the property or as a guaranty, and are liable to account for the profits arising from a resale of the premises by them. (Citing *Godfrey* v. *Dulton,* 16 App. D. C. 117; *Harten* v. *Loffler,* 31 App. D. C. 362; *Rawlings* v. *Collins,* 36 App. D. C. 72.)

No. 2407. Submitted April 23, 1912. Decided May 6, 1912.

\**Brokers' Commissions.*—For fraud and secret dealings or interest of real estate brokers as affecting their commissions, see note in 45 L.R.A. 33.

On right of broker to commissions where, with principal's consent, he becomes purchaser, see note in 31 L.R.A. (N.S.) 536.

HEARING on an appeal from a decree of the Supreme Court of the District of Columbia dismissing a bill for an accounting filed by the appellants.            *Reversed.*

The COURT in the opinion stated the facts as follows:

Appellants, plaintiffs below, as trustees of the estate of one Martha M. Read, filed a bill in equity against defendants, real estate agents, for an accounting to recover the profits made by them from the resale of certain lots in the city of Washington, which they are alleged to have sold as agents for plaintiffs.

It appears that defendants, having learned of the probable desire of one Louis C. Lehr to purchase the lots, opened negotiations with plaintiffs, which resulted in the submission of a written proposition on April 27, 1910, addressed to plaintiff Coughlan, the material parts of which are as follows: "We were to-day authorized to make you an offer of $2 per square foot for lots R and S, square 133, situate on Eighteenth street, between R and Riggs streets, this to include a 3 per cent commission to this office. If you and Mr. Dahlgren should desire to leave a trust of $7,500 or $8,000 on the property at 5 per cent, our purchaser is willing to assume this, or to pay all cash, if you prefer." This proposition was accepted by plaintiffs, and defendants were instructed to prepare a contract of sale. Accordingly, an agreement acknowledging receipt of a cash deposit of $500, which was to be forfeited by Lehr, the alleged purchaser, upon his failure to carry out the terms of the contract, was entered into on May 12, 1910, signed on behalf of plaintiffs by "Story and Cobb, agents," and subsequently approved by plaintiffs. It developed on the trial that one half of the deposit was advanced by Lehr and the balance by defendants. It was, however, left by permission of plaintiffs in the possession of defendants, plaintiffs supposing that it had, according to the contract, all been advanced by Lehr.

Delay ensued, and the sale was not finally closed until October following. Defendants conducted all the transactions on behalf of plaintiffs, and plaintiffs were paid the purchase price,

less defendants' commission, by the check of Marie C. Lehr, wife of Louis C. Lehr, for $7,000, and a check of defendants for the sum of $4,368. On the same day the deed to Lehr was recorded, a deed from Lehr to one Colliere, a clerk in the office of defendants, was recorded, and also a deed of trust from Colliere on the property for $7,000 to the American Security & Trust Company to secure one Ritchie.

It appears that the day before the proposition was submitted by defendants to plaintiffs the following agreement was entered into between Lehr and the defendant, Cobb:

2033 Florida Avenue,
April 26th, '10.

I hereby agree to purchase with Louis C. Lehr lots R and S, square 133, or 40 ft. frontage by 142 feet depth next adjoining on the north an alley (running east and west), situate on the west side of Eighteenth street, N. W., between R street and Riggs street, said lot to be purchased at a price not to exceed $2 per sq. ft., we to agree to hold jointly, as full a loan obtainable. I also personally guarantee Lehr against any loss by reason of failure to sell at a better price, with 5 per cent interest on the amount he invests. I will also sell to Lehr at the price I pay and 5 per cent interest from the time of such purchase.

Murray A. Cobb.

On June 9th following the contract with plaintiffs, defendants sold the lots to one Cameron for $2.50 per square foot, a profit of $2,842. June 21st, twelve days later, a formal assignment of one-half interest in this contract was written by defendant Story and executed by Lehr. The sale to Cameron was finally closed through the office of defendants in November, 1910. The court below entered a decree dismissing the bill, from which order this appeal was taken.

*Mr. Wharton E. Lester,* for the appellants:

1. Defendants acted as agents for plaintiffs. Have they shown the good faith required of agents?

Plaintiffs contend that their agents occupied a position antagonistic to them at the time the contract of sale was entered into. This is true whether, as plaintiffs claim, defendants were jointly interested in the property, or whether, as defendants claim, they were merely guarantors to secure Lehr against loss.

The underlying principle in the rule holding that an agent may not occupy a position antagonistic to his principal is not founded upon actual fraud, but upon public policy, which prohibits an agent from occupying a position in which his interest may, in any manner, conflict with those of his principal, and prohibits him from in any manner reaping a profit other than his commissions, and if he does either, the transaction may be set aside by the principal, or, if the property be sold, the principal may require an accounting for the profits. In such case the law may not presume actual fraud, but the position assumed by the agent furnishes an inducement to fraud and affords an opportunity to commit fraud, and the law will not sanction such duality of interest, for it is human nature for one to look more to his own interests than to those of another, and wherever such fact is found the law gives the principal the absolute right to repudiate the transaction, even if the agent act in good faith. Pom. Eq. Jur. § 959; Clark & S. Agency, § 407; *Porter* v. *Woodruff,* 36 N. J. Eq. 174; *Harten* v. *Loffler,* 31 App. D. C. 368; *Godfrey* v. *Dutton,* 16 App. D. C. 131; *Rawlings* v. *Collins,* 36 App. D. C. 72; *McKinley* v. *Williams,* 74 Fed. 94; *Leonard* v. *Olmstead,* 141 Iowa, 489; *Butler* v. *Agnew,* 9 Cal. App. 327; *Robertson* v. *Chapman,* 152 U. S. 682.

*Mr. Benjamin S. Minor, Mr. Hugh B. Rowland,* and *Mr. L. Randolph Mason,* for the appellees:

1. Assuming that the relationship of agency existed, were the appellees derelict in their duty?

It is contended that, even assuming the agency of the appellees to the fullest extent, they acted in good faith and violated no duty which they owed to appellants. *Robertson* v. *Chapman,* 152 U. S. 673; *Smith* v. *Tyler,* 57 Mo. App. 668;

*McGar* v. *Adams,* 65 Ala. 106; *Walker* v. *Carington,* 74 Ill.
446; *Walker* v. *Darby,* 5 Biss. 134; Clark & S. Agency, sec.
413.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

Defendants each admitted that they acted as agents for plain-
tiffs in making the sale, and their counsel also testified that he
recognized the fact of their agency. In fact, on the face of the
record, the relation of principal and agent between these par-
ties is conclusively established. Hence, the case must turn upon
the question of good faith on the part of defendants in acting
as the agents of plaintiffs. The relation of agent and principal
did not cease with the execution of the contract of sale, but ex-
tended continuously from the date of the submission of the
original proposition, in April, until the execution and delivery
of the deed and the payment of the consideration therefor, in
October. This being true, the defendants will be held to the
strictest accountability during the time the fiduciary relation
existed, or prior thereto, for all acts connected with or affect-
ing their agency.

It is contended by counsel for defendants that the instrument
of April 26th was only a guaranty by the defendant Cobb to
secure Lehr against loss in the event of his purchasing the prop-
erty. We think the instrument, in the light of the subsequent
transactions, in addition to the guaranty feature, must be con-
strued as an agreement between the parties to purchase the prop-
erty jointly, Cobb to secure Lehr against loss to the extent of the
money he should invest, with 5 per cent interest, or to sell his
interest to Lehr for the amount he invested, with 5 per cent
interest. Defendants being copartners, and Story having sub-
sequently shared in the profits of the transaction and taken part
in it, he is equally bound with Cobb to the conditions of this
instrument. The agreement, therefore, between Cobb and Lehr,
thus construed, places defendants in the position of purchasers
of the property for which they were at the same time agents.
Such a relation has been universally condemned, and will not

be upheld either on principles of justice or public policy. Assuming, however, that the agreement was a mere guaranty, it created a relation between defendants and Lehr antagonistic to the interest of plaintiffs, in that defendants would naturally seek to secure the property at the lowest possible figure, in order to minimize the probability of their becoming liable to Lehr. The antagonistic position of defendants to the interest of plaintiffs, established by the joint arrangement with Lehr, is emphasized by the subsequent assignment from Lehr to defendants of one half of the profits to be derived from the resale of the property; the furnishing of one half of the cash deposit; the advancement by personal check of a portion of the purchase price, and the admission that they received one half of the profits in addition to the commission charged plaintiffs.

The fiduciary relation established between the parties charged the defendants with a sacred trust, which demanded of them a complete, open, and frank disclosure to plaintiffs of every step taken in the transaction from the date of the creation of the agency until the transaction was finally closed. During that period defendants owed a duty to plaintiffs which forbade the placing of themselves in any attitude, however profitable, that would even appear to be antagonistic to the interests of plaintiffs, without first having secured their consent after a full disclosure. The practice of real estate agents in concealing from their principals the conditions upon which contracts of sale are procured cannot be too severely condemned. The name of the actual vendee, the true consideration, and every detail employed by the agent in bringing the parties together, should be promptly disclosed by the agent to his principal, and for failure to do so the courts will uphold the principal, not only in repudiating the transaction, but in recovering loss sustained by him or profit secured by the agent.

In a case of this sort the issue of fraud is eliminated. Where an agent voluntarily places himself in a position antagonistic to the interest of his principal, the court will not stop to consider whether any fraud in fact existed or was even intended, or whether the principal suffered loss. The principal has at his

disposal the option of repudiating the entire transaction, or of demanding and enforcing reparation for loss sustained, including commissions paid. The rule of law applicable to the state of facts here presented is well stated by Mr. Justice Harlan in *Robertson* v. *Chapman,* 152 U. S. 673, 681, 38 L. ed. 592, 595, 14 Sup. Ct. Rep. 741: "He [the agent] was precluded by the position voluntarily assumed by him from taking advantage of his principal, or from dealing with the property committed to his care in any other capacity than as an agent, who was bound to subordinate his own interests to those of his principal. He could not, directly or indirectly, become the purchaser and maintain any title thus acquired as against his principal; for, in so purchasing, his duty and his interest would come in conflict. If an agent to sell effects a sale to himself, under the cover of the name of another person, he becomes, in respect to the property, a trustee for the principal, and, at the election of the latter, seasonably made, will be compelled to surrender it, or, if he has disposed of it to a bona fide purchaser, to account not only for its real value, but for any profit realized by him on such resale. And this will be done upon the demand of the principal, although it may not appear that the property, at the time the agent fraudulently acquired it, was worth more than he paid for it. The law will not, in such case, impose upon the principal the burden of proving that he was in fact injured, and will only inquire whether the agent has been unfaithful in the discharge of his duty. While his agency continues, he must act, in the matter of such agency, solely with reference to the interests of his principal. The law will not permit him, without the knowledge or assent of his principal, to occupy a position in which he will be tempted not to do the best he may for the principal." The rule is also well stated and applied in Pomeroy's Eq. Jur. sec. 959; Clark & S. Agency, sec. 407; *Godfrey* v. *Dutton,* 16 App. D. C. 117; *Harten* v. *Loffler,* 31 App. D. C. 362; *Rawlings* v. *Collins,* 36 App. D. C. 72.

There are certain issues of fact presented in the record, which we have carefully examined, but do not think of sufficient importance to consider at length. The burden cast upon defend-

ants by the transactions reviewed in this opinion has not been discharged.

The decree therefore is reversed, with costs, and the court is directed to enter a decree for plaintiffs, as prayed for in the bill.                                              *Reversed.*