## JAY et al. v. GENERAL REALTIES CO.
### No. 402.

Municipal Court of Appeals for the
District of Columbia.
Nov. 15, 1946.

P. Michael Cook, of Washington, D. C., for appellant Bernice Jay.

Lowry N. Coe, of Washington, D. C., for appellant Fidelity & Deposit Co. of Maryland.

Louis Rothschild, of Washington, D. C., for appellee.

Before CAYTON, Chief Judge, and HOOD and CLAGETT, Associate Judges.

CAYTON, Chief Judge.

The suit was brought by General Realties Company to recover a secret profit of $2,500 allegedly obtained by defendant Bernice Jay, a licensed real estate broker, on the resale of property which plaintiff had turned over to her for sale. Joined as defendant was Fidelity and Deposit Company of Maryland which was surety on the bond furnished by defendant Jay in accordance with Code 1940, § 45—1405.

Trial was without a jury and on the conclusion of plaintiff's evidence both defendants moved for a dismissal. The motion being overruled, defendants declined to present any evidence and judgment was entered for plaintiff for the full amount claimed. This appeal followed.

The motion for dismissal had been taken under advisement and after briefs were submitted the trial judge, in announcing his ruling, filed a long and carefully prepared memorandum. We now recite in considerably condensed form the facts important to an understanding of this appeal as they were set out by the trial judge in his memorandum.

Defendant Bernice Jay became the agent of plaintiff for the sale of rooming house property at 1338 Vermont Avenue, N. W., and as such agent tendered to plaintiff a purchase contract dated May 5, 1945, signed by Roger N. Browne for $13,500, which contract plaintiff accepted. At the time Browne intended to complete the transaction and to operate a rooming house on the

premises. But a short time afterwards Browne and his wife decided that they would be unable to finance the transaction.[1] Browne told Jay about this and asked her to find someone to take the contract off his hands; Jay agreed to try and later informed him that she had procured a Mr. Harold K. Hampton to take it over. (The record shows that at the time Mr. Hampton's wife was employed in the office of Jay and that later Hampton himself went to work for her.) .

Though the purchase contract recited that Browne had put up a deposit of $500, he had in fact not done so but had given Jay his note for that amount and. Jay returned the note to him at or about the time she told him Hampton would assume the contract. Before the end of May, Jay deposited with the title company a total of $2,500 covering the $500 Browne was supposed to have paid and the additional $2,000 he was required to deposit in order to comply with the terms of the purchase contract. During the following month Jay ordered repairs made on the property and paid $650 therefor.

Jay told Browne and his wife to come to the title company for settlement on July 5 to sign the first and second trust notes and other documents connected with the sale; that there was nothing wrong in doing this, and that immediately thereafter they should transfer the property to Hampton. She also told the Brownes that she would take care of their notes. Accordingly the Brownes went to the title company and signed notes secured by a first trust of $9,000 and a second trust of $2,000, and other papers connected with the sale. Also present at that time were Mr. Young, president and treasurer of plaintiff company, and Mrs. Hampton, who worked for defendant Jay and represented her in the settlement. To complete the sale Young at that time executed the deed of plaintiff company as seller to Mr. and Mrs. Browne. It was recorded on July 11, 1945. At that meeting Young was not informed of the conversations which had taken place between Jay and the Brownes; nor that the Brownes were not completing the deal as actual purchasers; nor of their private arrangement with Jay under which they were to go to her office later that day and re-deed the property to Hampton.

In his testimony Browne denied that he was acting as straw man but admitted he knew he was not buying the property for himself. Mrs. Browne admitted that "she knew she was not the real buyer."

After the settlement at the title company had been completed the Brownes went to the Jay office and there on the same day executed a deed of the property to Hampton. This deed was acknowledged before Jay in her capacity as notary public. It was not recorded until much later, under circumstances we shall recite.

On August 2, a broker named Lawrence Johnson approached Jay in behalf of John Howard, a client of his who was interested in buying the property. The next day at Jay's office a contract was signed by which Hampton and his wife agreed to sell the property to Howard for $16,000, the purchaser to make a total cash payment of $4,500 and to assume the existing first and second trusts which had been executed by the Brownes in their settlement of July 5. In connection with this transaction Jay conducted the title search, and settlement was made at her office on August 9. On the following day the deed from the Hamptons to Howard was executed; and we shall later describe the circumstances under which it was recorded. In the meantime an error in the settlement figures was discovered in that the second trust payable to plaintiff General Realties Company (which trust Howard was assuming) was set up at $2,500 whereas it actually was $2,000. To take care of this discrepancy Jay requested and Howard gave her his note for $500, payable to her personally. When Johnson, Howard's agent, took Hampton's deed to the recording office he discovered that title to the property was still in the name of Browne and wife. Jay was then out of the city but upon her return this was called to her attention and she had the deed from

---

[1] There was also evidence that they decided to cancel the deal because of "personal differences" between Browne and his wife; but the reason for the cancellation is of little moment on this appeal.

the Brownes to Hampton recorded. This was on August 23, 1945 at 8:20 in the morning. At 12:54 the same day the deed from Hampton to Howard was placed on record.

In his memorandum the trial judge summarized the situation thus: "Neither defendant Jay, nor anyone on her behalf, informed plaintiff, General Realties Company, nor anyone acting on behalf of plaintiff, including Mr. Young, the President and Treasurer of this corporation, of the changes in the situation whereby Brown refused to go through with his contract of May 5, 1945, and had so informed defendant Jay, whereby he was required to purchase said property for the sum of $13,-500.00; nor that defendant Jay undertook to represent Brown to obtain another purchaser to take over Brown's contract; nor that defendant Jay had procured the Hamptons to take over said contract; nor that Brown had failed to make the cash deposit of $500.00 required under his contract, but instead had given to defendant Jay his note of $500.00 in lieu of said cash deposit; nor that said note of $500.00 had been returned by defendant Jay to Brown; nor that Brown had never deposited any cash under said contract of May 5, 1945; nor that under dates of May 25, 1945 and May 29, 1945 defendant Jay had deposited with the Title Company a total of $2,500.00 covering the initial deposit of $500.00 and an additional payment of $2,000.00 as part payment of the purchase price of $13,500.00 under said contract of May 5, 1945; nor that defendant Jay had expended the sum of $650.00 covering certain repairs upon said premises, part of which had been paid before July 5, 1945, the date of settlement at the Title Company as aforesaid, and part after said date of settlement at the Title Company; nor that Brown had been informed by defendant Jay that he and his wife should go to the Title Company on July 5, 1945, the date of settlement under said contract of May 5, 1945, and sign the first and second trust notes and the other documents required under said contract of May 5, 1945, and that thereafter the Browns should immediately transfer title to said property to Hampton; nor that defendant Jay had told the Browns that she would take care of their first and second trust notes so that they would not be held on the said notes * * *."

It was not until early in August, when Young called the Jay office to inquire about an overdue payment on the second trust, that defendant Jay revealed to him that the property had been resold.

All that we have recited were found as facts by the trial judge. Concerning such findings we need only say that we have very carefully examined the lengthy transcript and find that all such findings were supported by ample evidence.

But appellants complain that the judge went further—too far, they say—in drawing inferences from the facts. Principally those inferences or conclusions on which the ultimate finding for plaintiff was based were these: that the Brownes acted as straw parties at the time of the settlement between plaintiff and themselves; that the Brownes also acted as straws in the transfer later that same day from themselves to Hampton; that the Hamptons acted as straws in the later resale to Howard; that defendant Jay was the real party in interest in the acquisition of title from plaintiff and in the ultimate resale to Howard; that she was acting in her own interest and not in the interest of her principal and that she personally realized a profit of $2,500. The judge held that this conduct was in violation of the duty owing by Jay to plaintiff and in violation of the provisions of subsections (a), (c), (d), and (i) of Code 1940, § 45—1408, which we are setting out in the margin below.[2]

---

[2] The Code section prescribes the procedure whereby the Commission may suspend or revoke the license of a broker or salesman if he has "(a) Made any substantial misrepresentation; * * * (c) Pursued a continued and flagrant course of misrepresentation, or making of false promises through agents or salesmen, or advertising or otherwise; (d) Acted for more than one party in a transaction without the knowledge of all parties for whom he acts; * * * (i) While acting or attempting to act as agent or broker, purchased or attempted to purchase any property or interest therein for himself, either in his own

■■ We cannot agree with appellants that these inferences or conclusions are unreasonable or strained. On the contrary we think the evidence pointed quite reasonably and naturally to the result arrived at in the court below. The point is too well settled to be again labored here, that a broker owes his principal the highest fidelity and is by the obligations of his trust bound to inform the principal fully of every development affecting his interest; and particularly not to take any step or assume any position, secret or otherwise, from which he may reap a personal profit at the expense of the principal. These fundamental doctrines have been repeatedly and sternly declared by our courts.[3]

They have been restated by Congress in the Real Estate and Business Brokers' Act, quoted above in footnote 2. Just as no court may ignore them, so no court should hesitate to apply them rigidly when the circumstances warrant. In this case plaintiff's evidence built up a strong showing. It disclosed a departure from duty on the part of the agent and a complete failure to make important disclosures which the principal was entitled to receive. And in its full aspects it justified the inference that a secret profit had found its way into the pocket of the defendant. And yet the defendant met all this evidence with complete silence. Unexplained, it may very rightly be regarded as proving that plaintiff had by a series of maneuvers been deprived of a profit which rightfully belonged to it.

We do not say defendant was guilty of fraud; it is unnecessary to fasten that ugly label on the situation.[4] It is sufficient to say that the evidence reasonably supports the charge that she did not give her principal that scrupulous fidelity which the law demands of her. We say no more than that.

The question remains whether the plaintiff was entitled to the full sum of $2,500. That was of course the difference between the amount plaintiff was led to believe the property was bringing and the amount it actually brought. But it will be remembered that defendant expended $650 to have the house repaired. It is also true, as developed during plaintiff's case, that defendant paid Johnson a split commission of $400 on the ultimate resale. Appellee argues that in making the repairs Mrs. Jay was a mere volunteer; and the trial judge held that as far as plaintiff was concerned this was an "involuntary improvement" of the property. We are aware that some courts have taken the view that when an agent has made secret profits the principal is entitled to all such profits without any deductions for expenses incurred by the agent.[5]

■ But we think that save in exceptional cases such a rule is too harsh: it imposes a naked penalty, based more on retribution than on the equities of the situation. Stern though the law is in requiring an agent to repay secret profits, it is not so harsh as to say that a principal may recover more than the agent has profited. This is the reasoning of a number of cases which declare that the net rather than the gross profit realized by an agent should be the measure of recovery.[6] That is the reasoning we think we should adopt here.

■ In this view $650 should have been credited to defendants for the item of repairs; so also should the $400 paid to Johnson for commission. Deducting this total of $1,050 from the plaintiff's claim, we modify the ruling of the trial court so as to make the judgment in favor of plaintiff

name or by use of a straw party, without disclosing such fact to the party he represents * * * ."

3 Mannix v. Hildreth, 2 App.D.C. 259; Harten v. Loffler, 31 App.D.C. 362; Fox v. Cohen, 34 App.D.C. 389; Rawlings v. Collins, 36 App.D.C. 72; Dahlgren v. Story, 39 App.D.C. 29. See also Robertson v. Chapman, 152 U.S. 673, 14 S.Ct. 741, 38 L.Ed. 592; Urciolo v. O'Connor, 80 U.S.App.D.C. 112, 149 F.2d 386.

4 See Garner v. Woods, Mo.App., 24 S. W.2d 708.

5 Tobin Grocery Co. v. Spry, 204 Cal. 247, 267 P. 694; Raymond Farmers Elevator Co. v. American Surety Co., 207 Minn. 117, 290 N.W. 231, 126 A.L.R. 1351.

6 Anderson Cotton Mills v. Royal Mfg. Co., 221 N.C. 500, 20 S.E.2d 818; Sawyer v. Issenhuth, 31 S.D. 502, 141 N.W. 378; Willis v. Van Woy, 155 Fla. 465, 20 So.2d 690; Schwarting v. Artel, 40 Cal.App.2d 433, 105 P.2d 380; Dutton v. Willner, 52 N.Y. 312; Judevine v. Hardwick, 49 Vt. 180.

$1,450. So modified the judgment will be affirmed.

Modified and affirmed.

HOOD, Associate Judge (dissenting).

Accepting the findings of the trial judge and the uncontradicted testimony of plaintiff's witnesses, I think the substance of this case is as follows:

Plaintiff authorized Jay to find a purchaser for the property; Jay secured from the Brownes an offer to purchase at the price fixed by plaintiff, and plaintiff, after investigating the Brownes' financial responsibility, accepted the offer; the Brownes in making the offer acted for themselves alone and in good faith intended to buy the property; after the offer was accepted the Brownes for personal reasons did not wish to consummate the sale and so told plaintiff who informed them that it "was too late" and that the contract would have to be closed; the Brownes also informed Jay that they did not wish to go through with the deal and asked Jay to find someone to take over the contract; Jay put up the money to close the contract and had the Brownes convey to Hampton, who was acting as a straw party for Jay; and thereafter Jay sold to Howard at a higher price than that contracted for by the Brownes and thereby Jay realized a profit.

The sole question is whether Jay violated her obligations to plaintiff. When plaintiff authorized Jay to find a purchaser, Jay became plaintiff's agent. As such agent, she could neither act for a purchaser nor purchase on her own account, without first making full disclosure to her principal; her principal's interests were her interests; and so long as the relation continued she could not assume a position even remotely antagonistic to her principal. National Savings & Trust Co. v. Sands, 44 App.D.C. 20. With these principles the majority and I are in accord, but we differ in their application to the facts of this case.

The fact that a broker acts for a principal in effecting a sale does not prevent the broker from thereafter either acting as a broker for the new owner or purchasing for himself from the new owner, so long as the original sale was bona fide and free from collusion between the purchaser and the broker. Robertson v. Chapman, 152 U.S. 673, 14 S.Ct. 741, 38 L.Ed. 592.

In the instant case the Brownes contracted in good faith to purchase from plaintiff, at a price fixed by plaintiff and after plaintiff had investigated the Brownes' financial responsibility. After contracting to buy, the Brownes asked plaintiff to release them from their bargain and plaintiff refused. Up until this point, there is not the slightest suggestion in the record, or in the court's finding, of any dereliction of duty on the part of Jay.

The Brownes, finding themselves with a contract which they did not wish to complete but which plaintiff insisted should be completed, turned to Jay and sought her help in getting "it off their hands." The vital question in this case, as I see it, is whether at this point Jay was free to deal with the Brownes either as their broker or as a purchaser from them, without first making disclosure to the plaintiff.

At this point there was a binding contract of sale between plaintiff and the Brownes. Equitable title to the property had passed to the Brownes, and they were free to convey or dispose of such title as they saw fit. Lenman v. Jones, 33 App.D.C. 7, affirmed 222 U.S. 51, 32 S.Ct. 18, 56 L.Ed. 89. Both plaintiff and the Brownes recognized the contract as binding, with no power in either to rescind. Jay had performed the work for which plaintiff had employed her, i.e., had secured a purchaser acceptable to plaintiff. Before dealing with the Brownes, should Jay have first disclosed the proposed plan to plaintiff? If she had, what could plaintiff have done? Jay was purchasing from the Brownes. Would plaintiff have had a right to stop such sale or refuse to complete its sale to the Brownes?

The controlling principle is that no one shall be permitted to purchase an interest when he has a duty to perform inconsistent with the character of a purchaser. When Jay arranged to purchase the Brownes' interest, she had no duty to perform for plaintiff inconsistent with such purchase. Plaintiff had sold the property to the

Brownes and any profit made by Jay on the sale to Howard was a profit at the expense of the Brownes and not of plaintiff.

In a situation very similar to the present case the Supreme Court, in Robertson v. Chapman, 152 U.S. 673, 683, 14 S.Ct. 741, 745, 38 L.Ed. 592, said:

"If the sale to O'Donohoe was an actual sale, in good faith, so far as Polk had any agency in effecting it,—if the contract between the plaintiff and O'Donohoe had been so far executed, at the time Polk took O'Donohoe's place in the purchase, that it could not be rescinded by either party to it, —then Polk's agency in selling the property did not prevent him from purchasing from O'Donohoe; and his failure to give notice of his purchase, immediately upon its being made, cannot be regarded as a fraud upon the rights of the plaintiff."

I realize there is some language in Dahlgren v. Story, 39 App.D.C. 29, which appears inconsistent with the views here expressed, but in that case the original sale by the principal was engineered by the broker for the purpose of making a profit for the broker and his associates. I think the language of that case must be confined to the facts of that case, especially in view of Robertson v. Chapman, supra, cited in the Dahlgren case. See also, Hermann v. Hall, 9 Cir., 217 F. 947; Payne v. Beard, 8 Cir., 247 F. 247, certiorari denied 246 U.S. 666, 38 S.Ct. 335, 62 L.Ed. 929; Harvey v. Tucker, 136 Kan. 61, 12 P.2d 847; Magnolia Petroleum Co. v. Taylor, Tex.Civ. App., 173 S.W.2d 969.

In my view, Jay in purchasing from the Brownes violated no duty she owed plaintiff, and the judgment should be reversed.