URBAN INVESTMENTS, INC., et al., Appellants,

v.

Lillian BRANHAM, Appellee.

No. 79–816.

District of Columbia Court of Appeals.

Argued April 8, 1980.

Decided July 5, 1983.

Jeffrey M. Axelson, Washington, D.C., for appellants.

Clement Theodore Cooper, Washington, D.C., for appellee.

Before NEWMAN, Chief Judge, and MACK and FERREN, Associate Judges.

PER CURIAM:

In this case the trial court rescinded the parties' real estate sales contract, cancelled the corresponding deeds of trust, and ordered the vendor and its agent (defendant-appellants) to return to the purchaser (plaintiff-appellee) her $7,000 down payment. The court also awarded appellee $3,500 in punitive damages. Briefly stated, appellee Branham entered into a sales contract with appellant, Urban Investments,

Inc., for property located at 3715 Ninth Street, N.W. Soon after execution of the contract, appellee discovered that repairs (for which appellants were to be responsible) had not been made. She sought rescission of the contract and damages. The trial court granted her relief on the grounds that appellants breached their fiduciary duty to appellee, and that the resulting contract was unconscionable because of appellants' fraudulent misrepresentations and superior bargaining position. After reviewing the record and the relevant law, we hold, first, that the trial court erred in concluding that appellants had a fiduciary duty to appellee. We disagree, moreover, with the trial court's unconscionability ruling. Consequently, we reverse the judgment in appellee's favor.

## I

In January 1978, having recently inherited $20,000 from her husband, appellee Branham began looking for a home to buy. Branham, her son, and an acquaintance looked at a vacant house located at 3715 Ninth Street, N.W. The house was in a dilapidated condition, but Branham decided to purchase it anyway. Her acquaintance directed her to the office of A–1 Realty, a wholly-owned subsidiary of appellant Urban Investments, which owned the Ninth Street property. At the office, Branham met appellant Elaine Willis, secretary of Urban Investments and an employee of A–1 Realty. Branham told Willis that she wanted to buy the property if she would not have to put more than $7,000 down. Willis, after checking Branham's bank reference, said that financing could be arranged if Branham deposited the $7,000. Commenting on the condition of the house, Willis told Branham that the necessary work would be completed in two to three weeks.

Six days later, on January 18, Branham, accompanied by her two grown children, returned to appellants' office. Willis introduced Branham to Irvin Greenbaum, president of Urban Investments (and Willis' brother). At that meeting, Branham entered into a contract to buy the property for $52,500, putting $7,000 down and arranging with appellants for two deeds of trust for the remainder. The trial court found it was "understood that [Branham] would move into the house on January 29, and that all necessary repairs would be completed by then." The trial court also found that during negotiations, Greenbaum was in a superior position to exert his influence because of his status as an experienced real estate broker and his greater sophistication. Additionally, Branham was elderly and had a high school education, no business experience, and "little, if any, comprehension of the provisions of the various documents she signed."

At the time the sales contract and deeds of trust were executed, Urban Investments held a deed to the property stating it was subject to the interests of Louis Johnson and Aleushia Johnson. Urban Investments also held two unrecorded quitclaim deeds conveyed by the Johnsons. After settlement, appellants recorded both the quitclaim deeds (thereby removing the cloud on the title) and the deed conveying the property to Branham. On January 29, Branham went to the house and found that the repairs had not been started. She demanded rescission of the contract and return of her down payment. Appellants countered with evidence consisting of repair bills and eyewitness testimony showing that the repairs were at least substantially complete one week later.

The trial court concluded that appellants owed a fiduciary duty to Branham and breached it by failing to advise her to obtain independent counsel, by not disclosing that the two quitclaim deeds were unrecorded at the time of settlement, and by not reaching some "understanding" as to the necessary repairs. The trial court, relying on the manner of the negotiations, also concluded that the contract was unconscionable.

## II

The trial court predicated its damage award to Branham on appellants' breach of

a fiduciary duty of "fair dealing and full disclosure and the utmost protection of [Branham's] interests in the transaction," quoting *Brown v. Coates*, 102 U.S.App.D.C. 300, 302, 253 F.2d 36, 38 (1958). Specifically, the court said that no "competent and honest individual, seeking to protect the interests of the plaintiff," would "permit" her to sign the contract and settle without reaching an agreement about the necessary repairs, and without advising her to initiate a title search by a competent examiner or to obtain an independent appraisal. Certainly it is true that, if appellants had a fiduciary relationship with Branham, they must be held to a strict duty to act with utmost good faith and loyalty, in furtherance of her interests. The trial court, however, while not misconstruing the nature of a fiduciary duty in this context, nonetheless erred in deciding that appellants had a fiduciary duty to the purchaser here. We conclude the evidence is insufficient to support a finding that a special confidential relationship was established between appellants and Branham requiring appellants to treat the sale as anything other than an ordinary business transaction.

▆ The trial court is correct that, under well settled principles of law, "a broker owes his principal the highest fidelity and is by the obligations of his trust bound to inform the principal fully of every development affecting his interest." *Jay v. General Realties Co.*, 49 A.2d 752, 755 (D.C.Mun. App.1946) (suit by principal for recovery of secret profit does not have to be based on extreme ground of fraud; it is sufficient if broker did not give principal scrupulous fidelity that law demands); 12 Am.Jur.2d *Brokers* § 84, at 837 (1964). Because a broker is charged with protecting and advancing the principal's interests, a broker thus may not serve both parties to a trans-

action unless, under certain circumstances, the parties fully and freely have consented to the dual representation. *Goodman v. Woods*, 259 A.2d 594, 596 (D.C.1969); *Keith v. Berry*, 64 A.2d 300, 302 (D.C.Mun.App. 1949); 12 Am.Jur.2d, *Brokers*, § 87, at 840; *see Yerkie v. Salisbury*, 264 Md. 598, 601–05, 287 A.2d 498, 500–01 (1972) (where seller employs broker, broker's duty is to use skill diligence, and zeal for seller's "own exclusive benefit").[1] In sum, at least in the absence of informed consent by both vendor and purchaser, the "irreconcilable and conflicting" duties of the vendor's broker (to obtain the highest possible price for the property) and the purchaser's broker (to buy the property for the lowest possible price) preclude one individual from serving as agent for both principals. *Harten v. Loffler*, 31 App.D.C. 362, 368 (1908). If a broker attempts to act for both sides, "he is confronted with the impossible task of securing for each the most advantageous bargain possible." 12 Am.Jur.2d, *Brokers*, § 87, at 841 (footnote omitted).

In the present case, Elaine Willis, secretary of Urban Investments, and Irvin Greenbaum, president of Urban Investments, were agents for the vendor corporation.[2] As such, they owed their fiduciary duty of the "highest fidelity" to the vendor. *Jay, supra*, 49 A.2d at 755. Thus, unless other circumstances imposed a similar duty toward the purchaser (Branham), appellants were not permitted to serve both parties. *See Goodman, supra*, 259 A.2d at 596.

We have examined cases where courts have held that the vendor's broker also owed a fiduciary duty to the buyer. It is readily apparent that these cases present factors in addition to the ordinary business relationship between a prospective purchaser and the vendor's broker. For example,

1. If the broker acts only as a middleman, merely bringing the parties together without advising or acting on either party's behalf, the broker in some cases may act as agent for both parties. 12 Am.Jur.2d, *Brokers*, § 87, at 841; *see Harten v. Loffler*, 31 App.D.C. 362, 370 (1908).

2. The trial court states that "the broker fail[ed] to disclose his interest in the property." Yet, Branham testified that she understood she was purchasing the property from Willis and Greenbaum. In addition, the contract lists Urban Investments as the vendor.

in *Brown v. Coates,* 102 U.S.App.D.C. 300, 301–02, 253 F.2d 36, 37–38 (1958), relied on by the trial court, plaintiffs first hired the real estate broker to *sell* their home but were persuaded by the broker to exchange their home for one he showed them. When plaintiffs hesitated during negotiations, the broker affirmatively assured them that they did not need a lawyer because he was one and "would take care of them." The court there said that, "in this situation," the broker owed plaintiffs, both as vendors and purchasers, a high degree of fidelity throughout the transaction. *Id.* at 302, 253 F.2d at 38.

Similarly, in *Hammett v. Ruby Lee Minar, Inc.,* 60 App.D.C. 286, 53 F.2d 144 (1931), *cert. denied,* 284 U.S. 682, 52 S.Ct. 200, 76 L.Ed. 576 (1932), special circumstances created a fiduciary duty between defendants (a realty company and its president), who were trying to sell the property, and plaintiff, the prospective purchaser. Plaintiff was a long-time friend and former employee of Mrs. Minar, the company's president; she told a company salesperson that she would not go through with the transaction until she had personally consulted Mrs. Minar. After talking to Mrs. Minar, plaintiff signed a contract for property which she had never seen. In exchange for her regular payments, plaintiff did not receive a deed to the land; instead, she received a personal services contract requiring defendants to deliver the deed at the end of ten years. *Id.* at 289, 53 F.2d at 147. The contract thus was not a recordable deed, and, consequently, no one would be on notice of plaintiff's interest in the land.[3] The court there said, "These contracts, made in these circumstances, between par-

ties situated as these parties were, cannot receive the sanction of a court of equity." *Id.*[4]

In the case before us, however, there is no evidentiary basis for a finding of special circumstances to remove the present case from the general rule that the real estate broker must act for the exclusive benefit of the principal and for that principal only. Unlike *Brown,* there was no initial vendor-broker relation in this case that later developed into a purchaser-broker relation. Nor, as in *Brown,* did appellants affirmatively tell Branham not to procure a lawyer because they would look after her. And, unlike the realtor in *Hammett,* appellants were not friends of Branham; they had no reason to believe she would go forward with the sale only if they advised the same. Nor, as in *Hammett,* where the purchaser was advised to sign the contract even though she had not seen the property, are there facts in the present case suggesting that an unsuspecting party was lulled into a false security.

In sum, there is insufficient evidence of special circumstances here. That Greenbaum was "in a superior position by virtue of his status" as a broker does not alone imply a fiduciary obligation. The trial court states, "It is inconceivable that any competent and honest individual, *seeking to protect the interests of the plaintiff,* would permit her to consummate the deal without recommending she obtain independent advice or counsel" (emphasis added). Contrary to the court's understanding, the law does not charge the vendor's broker with protection of the purchaser's interest. At least in this case, where Branham approached appellants after she investigated

---

3. Additionally, the court referred to the "undue burdens and hazards" imposed on the buyer. *Id.* at 289, 53 F.2d at 147. Appellee here has not produced evidence of similar, unfair results. See Part III B. *infra.*

4. In *Hiltpold v. Stern,* 82 A.2d 123, 126 (D.C. Mun.App.1951), the court refers to the vendor who "won the trust and confidence of" the purchaser. Yet the court permitted cancellation of the contract because evidence sup-

ported the trial court's "finding of fraud" that the "price of the land which the defendant induced the plaintiff to buy" did not bear "any reasonable relation to its actual value." *Id.* at 126–27. *Hiltpold* stands for the proposition that the vendor has a duty not to fraudulently induce a buyer into a purchase; it does not follow, however, that the vendor or the vendor's agent has a fiduciary duty to act solely in the purchaser's interest.

the property in its state of disrepair, appellants were not required affirmatively to advise Branham to obtain outside advice or to refrain from bargaining with her until she did so.

### III

Having determined that appellants had no special fiduciary obligation to Branham, we turn to the trial court's determination that the contract itself was invalid and thus not binding. One who signs a contract, of course, is ordinarily obligated by its provisions. *Diamond Housing Corp. v. Robinson,* 257 A.2d 492, 493 (D.C.1969); *Hollywood Credit Clothing Co. v. Gibson,* 188 A.2d 348, 349 (D.C.1963). A contract will be unenforceable, however, if one party's assent was obtained through fraud or misrepresentation, or under circumstances that render the contract unconscionable. *Diamond Housing, supra; Hollywood Credit Clothing Co., supra; Williams v. Walker-Thomas Furniture Co.,* 121 U.S.App.D.C. 315, 319, 350 F.2d 445, 449 (1965). Relief will be afforded because "the minds of the parties did not meet 'honestly and fairly without mistake or mutual misunderstanding, upon all the essential points involved.'" *Hollywood Credit Clothing Co., supra,* 188 A.2d at 349 (citation omitted). *See also Bennett v. Fun & Fitness,* 434 A.2d 476, 480 (D.C. 1981) (this court applying Maryland law on unconscionability).

■ A. *Fraud.* Obviously, there cannot be an honest and fair agreement when one party fraudulently induces another to sign a contract. In such a case, the court will grant relief to the deceived party. *Lee v. Fisco Enterprises,* 233 A.2d 44, 46 (D.C. 1967); J. Calamari & J. Perillo, THE LAW OF CONTRACTS § 9–13, at 277–78 (2d ed. 1977).

The essential elements of fraud are: (1) a false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) with the intent to deceive and (5) action taken in reliance upon the representation. *Blake Construction Co. v. C.J. Coakley Co.,* 431 A.2d 569, 577 (D.C.1981); *Remeikis v. Boss & Phelps, Inc.,* 419 A.2d 986, 988 (D.C.1980); *accord Howard v. Riggs National Bank,* 432 A.2d 701, 706 (D.C.1981).

■ Branham points to the property's general state of disrepair on January 29, 1978 and contends that appellants' representations that all repairs would be completed by that date [5] were fraudulent and induced her to sign the contract.[6] It is important to note, however, that a "promissory representation, or a representation as to future events asserted in a common law fraud action, should only be considered a misrepresentation of fact where the evidence shows that the promise was made without the intent to perform, or that the promisor had knowledge that the events would not occur." *Bennett v. Kiggins,* 377 A.2d 57, 60–61 (D.C.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978); *accord Howard, supra,* 432 A.2d at 706. The fact that the repairs were not performed by January 29 does not support a conclusion that appellants, in representing that the repairs would be completed, never intended to carry out the promise; there is no other record evidence to support the inference that appellants' promise "was made without the intent to perform." To the contrary, appellants put forth evidence that the promised repairs were completed one week after January 29.

---

**5.** The evidence appears unclear as to whether time was of the essence (a repair date was not mentioned in the contract). The trial court, however, stated: "It was understood that plaintiff would move into the house on January 29 and that all necessary repairs would be completed by then." Whether time is of the essence may be a question for the trier of fact. *Murchison v. Peoples Contractors, Ltd.,* 250 A.2d 920, 922 (D.C.1969). Because we hold that there was no fraudulent misrepresentation, we decline to review the finding that time was of the essence.

**6.** Branham visited the property and observed its condition before consulting appellants. She therefore cannot claim she justifiably relied on any statement by appellants as to the existing condition of the property.

If we assume the facts in Branham's favor—that appellants promised completion of repairs by January 29, that this date was of the essence of the contract, and that the repairs were not done on time—there may be a cause of action for breach of contract. But this evidence does not support a conclusion that the promise was fraudulent. There is no evidence that appellants positively stated that something was to be done, knowing and intending the contrary. *See Howard, supra,* 432 A.2d at 706 (quoting *Bennett v. Kiggins, supra,* 377 A.2d at 61).

Nor did appellants' other actions constitute fraud. The trial court found that appellants (1) failed to disclose their interest in the property, (2) charged Branham for a title search they never intended to conduct for her benefit, and (3) did not disclose to Branham the existence of a cloud on the title. In the first place, although appellants may not have told Branham explicitly about their affiliations with the vendor, Urban Investments, Branham acknowledged during her testimony that she thought she was purchasing the house from Willis and Greenbaum, and the contract itself identifies appellant Urban Investments as the vendor. Thus, appellants did not actively conceal the ownership of the property, nor was Branham under a false impression.

Further, as to the issues concerning title, even if we assume that appellants' failure to order a title search and to disclose that the quitclaim deeds were unrecorded amounted to misrepresentations, they were not material; the contract provided that any defect of title could and would be remedied at the vendor's expense and would not permit the voiding of the contract. *See Bruffy v. Baker,* 69 App.D.C. 266, 267, 100

F.2d 439, 440 (1938) (per curiam) (if vendor is ready and able to remove encumbrances and convey clear title, existence of encumbrances does not relieve purchaser of obligation to buy). The quitclaim deeds, moreover, were recorded shortly after settlement of this contract. The record in this case, therefore, does not support the conclusion that appellants falsely represented material facts to Branham with an intent to deceive and, as a consequence, procured her assent to the contract.

**B.** *Unconscionability.* The purpose of the unconscionability doctrine is to prevent "oppression and unfair surprise." J. Calamari & J. Perillo, *supra* (citations omitted). Thus a "contract may be unconscionable either because of the manner in which it was made or because of the substantive terms of the contract or, more frequently, because of a combination of both." *Bennett v. Fun & Fitness, supra,* 434 A.2d at 480 (citing J. Calamari & J. Perillo, *supra,* § 9–40, at 325). These two elements are often referred to as procedural unconscionability and substantive unconscionability. *See* Leff, *Unconscionability and the Code—The Emperor's New Clause,* 115 U.Pa.L.Rev. 485, 539–40 (1967). Although both elements usually are present in unconscionability cases, we have indicated that "in an egregious situation, one or the other may suffice." *Bennett v. Fun & Fitness, supra,* 434 A.2d at 480 n. 4.

Usually, the party seeking to avoid the contract must prove both elements: "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Williams, supra,* 121 U.S. App.D.C. at 319, 350 F.2d at 449 (footnote omitted).[7] In this case, Branham arguably

7. *Accord Diamond Housing Corp., supra,* 257 A.2d 492 (tenant defending suit for possession alleged unconscionability of lease containing clause that waived her right to 30 days notice to quit; court disagreed because, although there may have been "absence of meaningful choice" attributable to the parties' unequal bargaining position, contract term waiving notice to quit was not unreasonable or unfair); *Tu-*

*lowitzki v. Atlantic Richfield Co.,* 396 A.2d 956, 960 (Del.1978) ("[s]uperior bargaining power alone without the element of unreasonableness does not permit a finding of unconscionability or unfairness"); *Weaver v. American Oil Co.,* 257 Ind. 458, 460–462, 276 N.E.2d 144, 146 (1971) (inquiry includes analysis of whether "the clauses involved are so one-sided as to be unconscionable under the circumstances exist-

demonstrated an absence of meaningful choice (procedural unconscionability) but failed to put forth evidence that the contract terms were unreasonably advantageous to appellants (substantive unconscionability). Under the circumstances, therefore, as elaborated below, we must reverse the trial court's ruling that the contract was unconscionable and thus subject to rescission.[8]

Without a prima facie showing that the contract itself or any item of it "affronts the sense of decency," J. Calamari & J. Perillo, *supra*, § 9–40, at 325 (citations omitted), it is difficult to grant rescission on the grounds of unconscionability. Without proof that the terms are unfair, the court normally will be unable to ascertain what detriment the weaker party suffered as a result of the bargaining process. Unless the sales tactics are "egregious," therefore, *Bennett v. Fun & Fitness, supra*, 434 A.2d at 480 n. 4, the party seeking to avoid the contract will have to show that "the terms are 'so extreme as to appear unconscionable according to the mores and business practices of the time and place.' " *Williams, supra*, 121 U.S.App.D.C. at 320, 350 F.2d at 450 (quoting 1 CORBIN, CONTRACTS § 128 (1963)); *Tulowitzki, supra* note 7, 396 A.2d at 960.

 Furthermore, although "[o]outlandish terms" in themselves may render a contract unenforceable, *Bennett v. Fun & Fit-*

*ness*, 434 A.2d at 481, it usually is difficult to determine from the four corners of the contract whether the terms are unconscionable; the commercial setting, purpose, and effect of the contract normally must be considered, and thus established through extrinsic evidence. *Patterson v. Walker-Thomas Furniture Co.*, 277 A.2d 111, 114 (D.C.1971).[9]

 The trial court relied on the manner of negotiations—procedural unconscionability—to declare the contract unconscionable here. The court stated "that in light of the divergence in expertise of the parties, the time frame in which the sale was completed, and the inability of the plaintiff to fully read and understand the contract, [ ] the sale of the property was not the result of an arms-length bargain and is unconscionable." Even if we assume the correctness of the trial court's implied finding that the negotiations deprived Branham of a meaningful choice,[10] we do not perceive these procedural factors to be egregious enough, in themselves, to support a ruling of unconscionability.

Nor is there record evidence that the negotiations resulted in contract terms that were unreasonably favorable to appellants. The only evidence presented as to the fairness of the terms consisted of the sale price ($52,500) and the value of the title insurance that appellants procured for the property ($16,500). The trial court stated "the

ing at the time of the making of the contract"); *W.L. May Co. v. Philco-Ford Corp.*, 273 Or. 701, 705–707, 543 P.2d 283, 286 (1975) ("party asserting unconscionability must demonstrate that the clause in question was unconscionable at the time the contract was made").

8. The court determines unconscionability as a matter of law. *Patterson v. Walker-Thomas Furniture Co.*, 277 A.2d 111, 114 (D.C.1971).

9. To this end, we encourage the use of discovery so that the party seeking avoidance of the contract may have a reasonable opportunity to present evidence that the substance of the contract is unfair in light of the surrounding circumstances. *Patterson, supra*, 277 A.2d at 114. Without evidence of the mores and business practices of the time and place, a court

has little if any basis on which to conclude that a contract is unreasonably favorable to one party. *See id.* (sufficient facts surrounding the "commercial setting, purpose, and effect" must be alleged and proved so that court may form a judgment as to existence of valid claim of unconscionability).

10. From the record it is clear that there was some inequality of bargaining strength attributable to appellants' superior real estate expertise and Branham's total lack of business experience. But we also note that Branham did not sign the contract until a week after she saw the property, and that she had an opportunity to read the contract: she admitted that she had not read all of the contract before she signed because she "can't read well without my glasses."

fact that the policy was in the amount of $16,500 may be some indication as to what defendants felt the property was worth." Title insurance, however, does not necessarily reflect the value of improvements on the land, and, in any event, appellants procured title insurance for Urban Investments, not for Branham. Thus, without record evidence that appellants insured the property for its resale value, it is speculative to assume that the title insurance policy is relevant here.

Moreover, the salient consideration in a substantive unconscionability analysis is not what the defending party "felt" the value was. Rather, the proper focus is the commercial setting, purpose, and effect of the contract. Branham presented no evidence as to the sale prices of comparable properties in the neighborhood. Nor did she show that appellants' financing arrangement was unreasonable in light of the business circumstances at the time the contract was executed. Without such objective evidence, a finding that sale of the property for $52,500 was unreasonably favorable to appellants cannot be sustained on this record.

Basically, a court cannot conclude in a vacuum, by reference to a $52,500 selling price, that this contract is unconscionable. Branham accordingly has failed to carry her burden of demonstrating that the contract is the result of egregious overreaching or, by its terms, is extreme and thus unconscionable relative to the mores and business practices of the time and place the contract was executed.

IV

This case presents an unfortunate situation in which a party entered a sales contract for residential property and later wished she had not. Although we are sympathetic with her situation, we must reverse the trial court's order that the contract was subject to rescission (and that appellants also must pay punitive damages). There were no fatal defects in the formation of the contract, and there was insufficient proof that the contract was unreasonably favorable to appellants.

*Reversed.*

MACK, Associate Judge, dissenting:

I

The trial court was acting in the noblest of judicial traditions when it ordered the rescission of this real estate sales contract, the cancellation of corresponding deeds of trust and the return to the purchaser of her $7,000 down payment. The majority of this court, in reversing, is preoccupied with cold principles of ordinary business transactions with which no lawyer would disagree; in blindly adhering to the principles however, and glossing over the special factual circumstances that remove this case from the ordinary mold, it is compelling a result that no court of equity should sanction.

I read the facts of this case as amply supporting the trial court's findings of unconscionable contractual dealings and breach of a broker's duty. In oversimplifying the transactions I run the risk of distortion but since I see the facts as supporting my conclusion, I take that risk. This record essentially shows that experienced real estate dealers have, by active and passive misrepresentations pressured an elderly widow, with little formal education and no business experience whatever, into turning over to them practically all the money she possessed for the down payment on the purchase price of a house which the dealers themselves owned and which they could with confidence expect to continue to own. The trial court, in a position to judge credibility, described it thusly:

The Court is satisfied that the defendants, upon learning that the plaintiff had $7,000 which she was willing to apply to the purchase of real estate, rushed through a contract and settlement without making any effort to apprise her of the various steps which she might consider to protect her interests.... In short, the defendants realized that they had hooked a prize fish and were careful to avoid leaving any slack in the line.

In my view, the manner in which this contract was made alone would support such procedural unconscionability as to require affirmance. *See Bennett v. Fun & Fitness of Silver Hill, Inc.,* 434 A.2d 476 (D.C.1981). Moreover, there are special circumstances here which remove this case from the operation of the general rule that a real estate broker acts for the exclusive benefit of his principal. *See Hiltpold v. Stern,* 82 A.2d 123 (D.C.Mun.App.1951); *Brown v. Coates,* 102 U.S.App.D.C. 300, 253 F.2d 36 (1958); *Hammett v. Ruby Lee Minar, Inc.,* 60 App.D.C. 286, 53 F.2d 144 (1931). ·

The facts show that this was no ordinary business relationship between a prospective purchaser and the vendor's broker. For all practical purposes, here the broker was the vendor. When Mrs. Branham (a widow with income from Veteran's Benefits and Social Security totalling $393 per month)[1] entered the A–1 Realty office on January 12, 1978, she was in fact entering the office of the wholly-owned subsidiary of appellant Urban Investments, Inc. She expressed interest in a vacant house if it would be made habitable. In doing so she told the office manager, Elaine Willis, who was also secretary of Urban Investments, how much money she had received from her late husband's estate, and where the balance of that money was deposited, and Ms. Willis promptly verified this fact. Six days later Ms. Willis was escorting Mrs. Branham and one of her children into the office of her brother, Irvin Greenbaum, a licensed real estate broker (who was the president of Urban Investments), where Mrs. Branham not only wrote a check for $7,000 and signed a contract for the purchase of the house from Urban Investments, but where, in the absence of any representative of a title company, she signed all the papers necessary to complete settlement on the property including the issuance of 1st and 2nd deeds of trust to Urban Investments. Mrs. Branham testified that she did not understand what she was signing. She said she thought she was signing a contract for rental with an option to buy—an arrangement she said she had learned about from a newspaper ad. She did not read the fine print of the contracts because she had no reading glasses with her. Mr. Greenbaum urged her to sign without explanation and she relied upon both Greenbaum and Willis.

In this respect, the trial court found that Mr. Greenbaum at the time held himself out as a broker, that he did not inform Mrs. Branham that he was also acting in the capacity of the owner of the property, that he did not point out that the owner was a corporation, that he and Ms. Willis were officers of that corporation, or that Mrs. Branham should seek advice from an independent person. Noting that appellants gave assurances of timely repairs to the property which were not, and were not intended to be, kept, the trial court also relied upon facts showing that appellants did not inform appellee of the then-existence of a cloud on the title of the property or the availability of title insurance to protect her interest (although Urban Investments subsequently procured insurance for its own protection). The trial court found incredible the testimony of Irvin Greenbaum that a title search, for which Mrs. Branham was charged, had been instituted prior to settlement.

Finally, the trial court made findings as to the status and relative sophistication of the parties—noting that Mr. Greenbaum, as a witness, exhibited the confidence gained by 15 years as a licensed real estate broker and that appellee and her children had very little, if any,[2] comprehension of the provisions of the various documents she signed.

---

1. Mrs. Branham's adult children were on Public Assistance.

2. Mrs. Branham's son who accompanied her to the realty office on the first visit, thought that his mother was going to rent the house. He did not know what a "mortgage" was. Mrs. Branham's daughter, who accompanied her at the combined contract-signing, settlement session, testified:

 [Ms. Willis] just kept asking questions about my father's death and that was all she said, and Mr. Willis [sic], he gave me this

As a matter of law, the trial court concluded that appellants owed a fiduciary duty to appellee, that appellee had the right to, and did, rely upon the competence, honesty and good faith of Mr. Greenbaum, and that appellants had breached a duty in not seeking to protect appellee's interest. Relying upon the divergence in the expertise of the parties, the time frame in which the sale was completed, and the inability of the plaintiff to fully read and understand the contract, the trial court found that the sale of the property was not the result of an arms-length bargain and was unconscionable. Finally, the trial court found that Willis and Greenbaum, acting in concert, willfully and fraudulently made promises knowing that they could not fulfill the same, to induce appellee to sign the sales contract and immediately proceed to settlement.

## II

In this court, I am somewhat puzzled by the majority's reluctance to apply a theory of unconscionability. In *Bennett v. Fun & Fitness of Silver Hill, Inc., supra,* we noted that "[a] contract may be unconscionable either because of the manner in which it was made or because of the substantive terms of the contract or, more frequently, because of a combination of both" (citing J. CALAMARI & J. PERILLO, CONTRACTS § 9–40, at 325 (2d ed. 1977)). We added "we do not understand . . . [the] decisions necessarily to require the presence of both elements to establish unconscionability; in an egregious situation one or the other may suffice."

*Bennett, supra,* 434 A.2d at 480 n. 4. As to the manner of making a contract, we noted that it was important for the trial court to consider whether the seller identified and explained the contract, particularly those which might be viewed as unusual or unfair.[3] We also recognized that sales tactics were relevant—whether there was a weaker bargaining position or lack of sophistication on the part of one party exploited by the other party. *Id.* at 481. Applying these considerations, I would find no difficulty in concluding that the trial court was correct in finding the manner of making this contract so egregious as to be unconscionable. Appellants have exploited an unequal bargaining power to obtain a $7,000 windfall knowing full well that the windfall would become a *fait accompli.* In my view, no second line of inquiry into the substantive terms of the contract is necessary. If the record shows that appellee's financial situation was such that she could not pay for the house, and that appellants, in inducing her to make a down payment and in taking over 1st and 2nd trusts for the same, knew this fact, the favorable or unfavorable terms of the contract are of no moment.

I am likewise puzzled by the majority's strong reliance on the established principle that it is a broker's duty to act solely for his principal's benefit. Here the broker was acting for his own benefit. I am, therefore, unimpressed by the majority rationale in attempting to distinguish cases which have held that special circumstances create a degree of fidelity owed by a broker to a

paper to read. And as I was to read it and I told him I didn't understand it then he took it back from me and said I didn't have to understand it. It was just some papers saying that the house belonged to my mother and how much rent she had to pay every month. The daughter had never seen a contract to purchase property before and she had never seen a settlement sheet. Asked if she would remember what the papers that her mother signed looked like, she replied: "I know it was white papers."

3. *See* RESTATEMENT (SECOND) CONTRACTS, § 231 Comment d (Tent.Draft No. 5, 1970) (bad faith

performance inferred from an abuse of a power to specify terms).

If the mistake of the party who signs or accepts an instrument without reading it is induced by the artifice or misrepresentation of the other party, of course the contract is voidable by the mistaken signer. This is most often illustrated by cases in which the signer is illiterate or is unfamiliar with the language in which the contract is written but is equally applicable in any case in which one party causes the mistake that the other is making when he signs. (Footnotes omitted.)

3 CORBIN, CONTRACTS, § 607 (1960).

purchaser. *Cf. Brown v. Coates, supra.* In truth, such analysis, in painstakingly separating the concepts of duty and unconscionability does not recognize the underpinnings of these decisions—that the fiduciary relationship operates to insure that the broker, by way of his superior position, cannot through devious and unfair practices, win the trust of an unsuspecting party and lull that party into taking a loss operating to the *broker's* benefit.

It is worth remembering that the common law recognizes that a realtor, in addition to the duties of loyalty and good faith he may owe to his principal, owes the public, including a prospective purchaser, the duty of fair dealing and honesty. *See Funk v. Tifft,* 515 F.2d 23 (9th Cir.1975); *Ward v. Taggart,* 51 Cal.2d 736, 336 P.2d 534 (1959) (en banc); *Harper v. Adametz,* 142 Conn. 218, 113 A.2d 136 (1955); *Quinn v. Phipps,* 93 Fla. 805, 113 So. 419 (1927).[4]

Moreover, the general duty that a broker owes to the public is suggested in *Brown v. Coates, supra* where then-Circuit Judge Burger wrote:

> Appellant was a licensed real estate broker. He held himself out to the public as a person in whom the public could place trust and confidence in real estate transactions. (Footnote omitted).

*Id.* 102 U.S.App.D.C. at 302, 253 F.2d at 38.

Factually, *Brown* involved an "exchange contract," where a broker induced homeowners to convey absolute title to their home to him, in exchange for a new home with the resulting effect that the homeowners lost all equity in the old house and were obligated to pay the full price for the new house. The circuit court had no difficulty in finding a fiduciary relationship arising out of the contract noting:

> In this situation appellees had a right to rely on the competence, honesty and good

faith of appellant, assured that he would guard their interests; conversely, appellant must be considered to have owed appellees a high degree of fidelity—foremost being the obligation of fair dealing and full disclosure and the utmost protection of their interests in the transaction.

*Id.*

In my view, the instant case presents a situation analogous to that of *Brown.* Here, as in *Brown,* appellee was led to believe that the real estate broker, who conducted the entire transaction and held himself out as a broker, was looking out for her interests. In *Brown,* the inducement was fed by assurances leading the appellees to conclude that, in dealing with the broker, outside advice was not needed; in the instant case, the inducement was fed by assurances that appellee's wishes would be complied with, by exerting unusual time pressures, and remaining silent on critical matters, designed to keep what was even more of an unequal bargaining position (than in *Brown*), unequal. In both instances, it was the broker who in fact profited independently.

For guidance as to the general concept imposing the duty of fair dealing and honesty, this court may look to other jurisdictions. Some courts have found a basis for the rule in general principles of equity (*see Harper v. Adametz, supra*); or in state statutes governing the conduct of professionals (*see Ward v. Taggart, supra*). In some cases courts have attributed the duty to the realtor's position as a knowledgeable intermediary. *See Funk v. Tifft, supra,* 515 F.2d at 25.

Sound policy reasons account for this rule of fairness and honesty. First, such a duty is recognized by the real estate profession itself through the rule that a realtor, in

---

4. In principle, this concept is incorporated in statutory provisions providing for the revocation or suspension of a broker's license where, *inter alia,* the broker has made substantial or continuing misrepresentations, acted for or received compensation from more than one party without disclosures to all parties, demonstrated such unworthiness as to endanger the interest of the public, or been guilty of any other conduct "whether of the same or different character from that hereinbefore specified which constitutes fraudulent or dishonest dealing." D.C. Code § 45–1908 (1981).

addition to his duty to the seller, has an additional "obligation to treat fairly all parties to the transaction." Code of Ethics of the National Association of Realtors, Art. 7.[5] Second, the rule protects the unsuspecting and unknowing novice from exploitation by a professional with superior knowledge.

The instant case is replete with evidence from which we could find the breach of a common law duty of fairness and honesty. First, appellants did not disclose to Mrs. Branham that they were record owners of the property and were acting in their own interest; they did not tell her of the existence of a cloud on the title and the unrecorded quit claim deeds purporting to remove such cloud on the title. This would have deprived even a more sophisticated purchaser of the opportunity to fully consider the fairness of the transaction or the worth of the property. Significantly appellants charged Mrs. Branham for a title search that was never performed for her. Second, appellants rushed appellee (a woman with a limited education, poor eyesight, and children whose testimony reveals an ignorance of the distinction between rent and mortgage payments) through a combination contract-signing and settlement session without advising her that she might want outside advice and without explaining to her the significance of the documents she was signing. Moreover, reasonable inferences can be drawn here that appellants never intended to make timely repairs; the repairs so crucial to her acceptance were never itemized and, in fact, the trial judge found that the promises to make prompt repairs were fraudulently made to induce appellee to sign the contract quickly. Finally, the entire transaction was unorthodox and varied considerably from accepted real estate practice.

I would not consider affirmance in this case to pose any threat to established principles of real estate law. I would hold merely that in the circumstances here, where appellants have acted from a superior posture as broker, undisclosed seller, and holder of promissory note, and have led an unsuspecting purchaser to part with $7,000 in the process—to appellants' benefit and without any hope of equitable benefit to the purchaser—rescission is justified. Such holding would be in keeping with traditional principles that

> equity has carefully refrained from defining a fiduciary relationship in precise detail and in such a manner as to exclude new situations. It has left the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other.

*Harper v. Adametz, supra,* 113 A.2d at 139.

Finally, I would suggest that the majority does not tell the whole story when it categorizes this case as merely an unfortunate situation in which a party entered a sales contract for residential property and later wished she had not. It is a fact of life that there are many people who live a lifetime paying rent, not by choice, and who dream of owning a house. This dream, when coupled with lack of education, sophistication, and resources, make such people an easy prey to others who would benefit at any cost. While I am not suggesting that a broker has a duty to be his "brother's keeper," I do suggest that this case is not one lending itself to the application of "caveat emptor."

I would affirm.

---

5. It is interesting to note that Mr. Greenbaum testified: "I'm a licensed real estate broker. As a licensed real estate broker I offer an amount of protection to the buyer and seller as well."